### JOVA BRICK WORKS, Inc., v. CITY OF NEW YORK et al.

(Circuit Court of Appeals, Second Circuit. November 16, 1921.)

No. 15.

1. **Collision ⊚⇒71(3)—City held at fault in keeping scows moored where they obstructed navigation.**

   Where a city, for its own convenience, left scows moored near its disposal plant, so as to obstruct a channel from March 25th to the morning of the 27th, it assumed the risk, and was at fault in connection with a collision with a line of tows being taken through the channel.

2. **Shipping ⊚⇒54—Charterer, failing to return scow in good condition, liable for damages.**

   A charterer of a scow, receiving it in good condition and agreeing to return it in like condition, reasonable wear and tear only excepted, must respond in damages for the sinking of the scow from a collision, unless it establishes a valid defense.

3. **Admiralty ⊚⇒105—Defense not made below not available on appeal.**

   Where a city, sued for damages to a scow chartered to it, by its answer and petition bringing in third parties, and its amended answer and amended petition, alleged that a collision and the resulting damages were due to the fault and negligence of such third persons, and did not plead any negligence on the part of the owner of the scow, it cannot be permitted on appeal to claim negligence on the part of the captain of the scow, who was the owner's appointee.

4. **Shipping ⊚⇒58(2)—Evidence held to show damaged scow was chartered to defendant by broker for libelant.**

   In a suit against a city for damages to a scow, chartered to it and damaged in a collision, evidence *held* to show that the scow was chartered to the city by one acting as broker for the libelant.

5. **Collision ⊚⇒115—Towing company, mooring scow where directed by employer's representative, not liable for subsequent collision.**

   Where a towing company, employed by a city to tow loaded barges to the city's disposal plant, moored them at the point where it was directed to so do by those in charge of the disposal plant, and at the only place where they could be moored, it was not liable for the subsequent sinking of one of the barges from a collision with a line of tows being taken through the same channel.

6. **Collision ⊚⇒71(2)—Tugs with tows not at fault in attempting to pass through channel without requesting removal of barges obstructing navigation.**

   Where a city had moored a number of barges in the Arthur Kill, so as to obstruct the channel, tugs with a fleet of boats in tow were not at

---

⊚⇒For other cases see same topic & KEY-NUMBER in 'all Key-Numbered Digests & Indexes

fault in attempting to pass through such channel without sending a scout tug ahead to request the removal or shifting of the barges, though the captain in charge of the tow had been through the channel the night before, and knew the barges were there, in view of the inexcusable and presumably temporary nature of the obstruction.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by the Jova Brick Works, Inc., against the City of New York, which brought in the Shamrock Towing Company and another. From a decree for the libelant, the City appeals. Affirmed.

John P. O'Brien, Corp. Counsel, of New York City (Charles J. Carroll, of Brooklyn, N. Y., of counsel), for appellant City of New York.

Macklin, Brown, Purdy & Van Wyck, of New York City (Pierre M. Brown, of New York City, of counsel), for libelant appellee.

Alexander & Ash, of New York City (Peter Alexander, of New York City, of counsel), for impleaded appellees.

Before ROGERS, MANTON and MACK, Circuit Judges.

ROGERS, Circuit Judge. The libelant corporation on March 19, 1918, chartered to the city of New York, through its department of street cleaning, its brick barge, J. J. J. No. 6, to be used by it in the disposition of street sweepings and other refuse material gathered in the streets of the municipality, to be carried from its dumping boards on the water front to its various disposal plants. The barge was delivered into the city's possession, and was operated by it until March 27, 1918, when a collision occurred off the Port Ivory Fill, Staten Island, where the barge had been moored, which resulted in such serious damage that the barge sank. It is alleged that this was due to the negligence of the city of New York in leaving the scow in a dangerous and exposed position.

The city of New York, by petition under what was then the Fifty-Ninth rule in admiralty (33 Sup. Ct. xxxv), brought in the Shamrock Towing Company and the Director General of Railroads, operating the Philadelphia & Reading Railroad. We shall hereafter refer to the city of New York as the city, to the Shamrock Towing Company as the towing company, to the Director General of Railroads as the Director General, and to the barge as No. 6.

The charter was oral, and it provided, among other things, that the owner should deliver No. 6 to the city with one man on board, called a captain, and that it should receive therefor the sum of $15 per day, including the wages of the so-called "captain." The city agreed on its part to return the No. 6 to the owner in the same good order and condition as when received, reasonable wear and tear excepted. By its charter the city became the owner of the scow pro hac vice.

The city engaged the towing company to do the towing. On March 25, 1918, the loading of No. 6 having been completed, the towing company, acting under its contract to perform the towage service, started

out with the No. 6 and three other loaded scows for the disposal plant at Port Ivory in charge of its tug, the Robert J. McGuirl. In a cove at Port Ivory the city had a row of spiles, at which it moored vessels while waiting to be discharged. In length the spiles provided berths for three scows, making it possible to make fast three tiers of scows. The city also had a dredge on the shore between the spiles and the bridge, which it used in unloading its scows. On the same day the towing company had taken down four other scows in charge of its tug Elizabeth McGuirl. At Elizabethport the tugs combined their two tows into one tow of eight barges, believing that by so doing they could handle and land them to better advantage.

When they reached Port Ivory they asked the representative of the city in charge of the plant where he wished the boats landed, and he told them to make fast alongside of the other scows, which were then lying at the spiles. One of the tugs then held the scows abreast of the spiles, and the other shoved the boats in, where they were made fast. The tugs then shifted the various scows and evened them up, so as to have the same number in each tier. As finally adjusted, the Jova was the outside boat in the middle tier. At the request of the city's representative they also took out the scow Hannah E. W. and shoved her over to the digger, to be unloaded in the morning. After this had been done, the masters of the tugs asked the captains of the various vessels in the tow whether they were all right, and, on receiving an affirmative reply, they left and came back to New York.

The city, instead of proceeding with the unloading of the vessels, did nothing during the day and night of the 26th, and on the morning of the 27th, while the Philadelphia & Reading tugs were coming through with a heavy tow of 28 loaded vessels, the tail of the tow got out of line and swung so far to starboard that it came into contact with the moored scows, and so damaged No. 6 that she filled and sank.

The evidence shows that the city had undertaken to make an improvement at its plant at Port Ivory. Among other things, it had dredged the channel into and in the vicinity of its digger, so as to permit the unloading of more than one vessel at a time. The work had so far progressed by March 22d that the city contemplated having the dredging finished and its plant ready to operate by the morning of March 25th. On the latter date it had either four or seven loaded vessels lying at the spiles, and in order to keep the plant busy it ordered the towing company to tow the eight loaded scows in question down to and leave them at the plant. The city, however, made a mistake in its calculations to the extent that it did not complete its dredging until the evening of March 26th. Although it was perfectly well aware of the situation, it did not countermand the order, but sent the scows to its plant on March 25th, and kept the scows at the mooring spiles from the evening of that day until the morning of the 27th, when the collision occurred.

[1] If it had discharged the cargoes on the morning of the 26th, as it had contemplated, the accident would not have occurred. It preferred, for its own convenience, to leave the boats where they were, and in doing so assumed the risk, and must be held in fault.

[2, 3] It appears to be admitted that, at the time the No. 6 was delivered to the city, she was in good condition. Under the terms of the charter the city was under obligations to return her in like condition, reasonable wear and tear only excepted. This obligation the city did not fulfill, and clearly it must respond in damages therefor, unless it can satisfy the court that it has a valid defense to this suit. It seeks now to find such a defense in the claim, advanced for the first time in the argument in this court, that the "captain" of the No. 6, who was the appointee of the libelant, should have shifted her position between the time she was moored and the time of the collision, and that his negligence in that particular is to be attributed to the libelant, his master. It is answer enough to this contention to say that the position thus taken has no support in the pleadings. In the city's answer to the libel, and in its petition to be permitted to bring in the towing company and the Director General, it alleges that the collision was caused solely by the fault and negligence of the towing company, and of the tugs Bern, Pencoyd, and Wyomissing, which tugs were owned and operated by the Port Reading Railroad Company.

The city subsequently filed an amended answer and amended petition and in both it again charged that the collision and damages resulted solely from the fault and negligence of the towing company and its tugs Bern, Pencoyd, and Wyomissing. It not only did not plead the libelant's negligence, but it made no suggestion, when the case was in the court below, that it in any way attributed negligence to the libelant. It certainly cannot be permitted, after it comes into this court, to introduce into the case an issue not raised by the pleadings, and not before the court below.

The evidence conclusively shows that the city, through its officials and employees, directed where the No. 6 should go, and on her arrival at her destination the city's representatives in charge of the disposal plant directed where she should be placed.

[4] The allegation in the libel is that the libelant leased the No. 6 to the city. The city in its answer denies that allegation, and asserts that it chartered the scow from the towing company. In other words, the claim of the city is that the towing company chartered its own vessel to the city, towed its own property to the Port Ivory spiles, and itself created an obstruction to navigation, for which it alone is liable.

The president and treasurer of the towing company testified that he had barges of his own that he had chartered, and that as broker he also chartered barges for other people; that at the time involved herein he had the No. 6 in his hands to charter for her owner, the libelant; that the street cleaning department called him up on March 19th, and asked him if the towing company had any scows to charter, and he replied that it had not and all its boats were busy; that he informed the department that there were three or four of the company's customers in the brick business who had light scows on account of navigation being closed in the Hudson river, and that he would like to charter them to responsible people; that he informed the department he was acting as agent and broker for these scows and chartered them

on a commission; that he could charter the No. 6; that she was sound, safe, and seaworthy, and must be returned in the same condition, or could not be taken; that the price to be paid was $15 per day; and that a little later the department called him up and instructed him to take the scow to Ninty-Sixth street, North River, and put her under the city's dump; that the No. 6 was towed to Ninty-Sixth street and delivered over to the department; that he chartered the scow as an individual broker, and not as the towing company, and the department was so informed.

This conversation appears to have been had with one Mr. Green, who represented the department of street cleaning, and whose testimony does not contradict that given by the broker. The court below was satisfied, and this court is equally so, that the No. 6 was chartered to the city by Mr. McGuirl, acting as a broker for the libelant, and that the libelant can recover as owner of the No. 6 for the breach of the charter, in that it did not return the vessel in the same order and condition as when it received it, reasonable wear and tear being alone excepted.

The manner in which the city paid the charter hire has not the controlling significance which we are asked to give it. The city paid the towing company for the use of all the scows, including the No. 6, and the towing company then paid over to the libelant the amount of the charter hire to which it was entitled, less the commission which it paid to the broker. This was a mere matter of convenience for all parties, and was in accordance with a course of business which had existed for a number of years. It does not overcome the testimony of the broker that the charter was given by libelant to the city.

[5] We fail to find any ground of liability on the part of the towing company. That company was employed by the city to take the barges to the disposal plant at Port Ivory. This duty it performed, and on arrival at the plant the captain having charge of the tow inquired of those in charge of the plant where the No. 6 should be moored, and he placed her where he was instructed to put her. He testifies that there was no other place there where he could have moored the tow. The acting foreman at the plant, and who was in charge and on duty that night, when the tow arrived, testified there was no other place to put the boats. The man who had charge of the plant next morning was asked why he did not have the boats moved, and he testified that he had no place to put them. The towing company having put the scows exactly where it was instructed to place them, and in the only place where it was possible to put them, and having arranged them as well as the conditions there permitted, is free from fault. When a tug leaves her tow in the place selected by the owner of the vessel, her obligation is at an end; the accident being in no way due to the fault of the tug. The Nellie, Fed. Cas. No. 10,094, 8 Ben. 261. It is difficult to understand how it can be seriously argued that a breach of the contract of towage is made out.

And certainly the city, having directed the towing company to place the tow where it was put, cannot thereafter hold the company respon-

sible for doing what it instructed it to do. See The New York Central No. 18, 257 Fed. 405, 168 C. C. A. 445. The contention that the tug was in fault for not disobeying the orders of the city to tie up its scows at its own wharf carried with it its own refutation. Certainly the towing company was not an insurer of the city's scows, against its own acts and its own method of doing business.

[6] But the city also contends that the Director General is liable, because, in operating the Philadelphia & Reading Railroad, the tugs belonging to that corporation took an unwarranted and unmanageable tow of 28 coal boats through the Arthur Kill, and because of the careless and negligent manner in which the tow was handled, one or more of the scows included in the tow got out of tier and caused the collision in question. This contention of the city cannot prevail. It seems to be admitted that the tow was carefully handled. But it is said that, as the captain in charge of the tow had been through the channel the night before and saw the scows there, he should not have attempted to navigate through the next morning, or else sent a scout tug ahead with a request to remove or shift the barges.

We cannot assent to either of these propositions. In the case of the Wyomissing, 232 Fed. 453, 146 C. C. A. 447, we held that under the circumstances of that case it was incumbent to send a tug ahead to request that a government dredge, which was obstructing navigation, should be moved. But in that case the dredge was lawfully where it was in the discharge of government work. In a case such as the one now before the court, where the obstruction to navigation is wholly unlawful and inexcusable, and presumably temporary, it would impose a wholly unwarranted burden on shipping to say that, while the illegal obstruction continued, the right to navigate the waters was suspended, or could only be exercised by sending a tug ahead to request its removal.

At the time of the collision the scows used by the city, including No. 6, and which were moored at the row of spiles as the city had directed, and which was the only berth the city provided, constituted an obstruction to navigation. The court below so found. He stated that the city "had created an obstruction in the channel, and, in view of the traffic through these particular waters, a serious obstruction." Without going into details, it may suffice to say that in our opinion the finding is amply justified by the testimony.

Decree affirmed.