Matthew B. Clark, Jr., an Infant, by Matthew B. Clark, Sr., His Guardian ad Litem, Claimant, *v.* State of New York, Defendant.   (Claim No. 28415.)

Matthew B. Clark, Sr., Claimant, *v.* State of New York, Defendant.   (Claim No. 28420.)

Court of Claims, May 6, 1949.

*C. E. Fitzgerald* and *Thomas J. McCarthy* for claimants.

*Nathaniel L. Goldstein, Attorney-General* (*Arthur W. Mattson* and *Edward R. Murphy* of counsel), for defendant.

LOUNSBERRY, P. J. On February 9, 1946, the claimant, Matthew B. Clark, Jr., then nineteen years of age, was participating in the North American championship four-man bobsled races, conducted at the Mt. Van Hoevenberg bobsled run near Lake Placid, New York, under the auspices of the Adirondack Bob-Sled Association, an affiliate of the Amateur Athletic Union of the United States. On his team's second heat, the sled failed to negotiate the reverse curves known as Zig-Zag, and hurtled over the almost perpendicularly banked curve into the snow-covered and wooded mountainside. The claimant sustained several fractures of his left leg, his left lung was collapsed, he was badly shaken and bruised, and suffered profound shock.

State employees assumed charge of the claimant and his teammates, provided stretchers and blankets, transported claimant and one teammate down to the finish point of the bobsled run in a State-owned open dump truck, there transferred him to a State-owned pickup truck with canvas canopy, and delivered him to the Lake Placid Hospital, where a cast was immediately applied to his leg following the taking of X rays. After a few days it was discovered that normal circulation had not returned to the injured left leg; subsequently gangrene set in, and in December of 1946, the leg was amputated above the knee.

The claimant makes no claim for the original accident and injury, and does not attribute the same to any fault of the State with respect to the condition of the run or the sled. His claim, and that of his father for medical expense and care, is based on the alleged negligence of the State in failing to provide prompt medical and hospital care, or prompt and proper conveyance to a place where such care might be obtained. More specifically, claimant contends that he suffered undue exposure to cold through an unreasonable delay in removing him from the snow, lack of sufficient covering, and transportation in unheated open vehicles; and that such exposure greatly aggravated his shock

condition, caused the failure of circulation, the ensuing gangrene and the resulting amputation.

The Mt. Van Hoevenberg bobsled run, the only such run on this continent, was originally constructed by the State of New York for the 1932 Olympic Games. Since that time, except for a period between March 1, 1942, and December 2, 1945, it has been operated and maintained by the Conservation Department for the use of the public. The State provides sleds for race participants, carries passengers on State-operated sleds, and charges admission fees to spectators. There is a clubhouse, a public address system, watchers' booths, and bleachers for spectators. A crew of twenty to fifty men go to considerable trouble to maintain the run in high-speed racing condition. During each season a number of amateur races are conducted under the auspices of the Adirondack Bob-Sled Association or like groups.

The run itself is a mile in length, contains a number of sharply banked curves, and lends itself to racing which is at once fast and dangerous. In fact, some forty-five accidents occurred between December 30, 1934, and February 9, 1946. The record for the mile run for a four-man team is one minute, five and one-fourth seconds from a standing start, which means that the sleds exceed a speed of sixty miles per hour at points in the descent.

Arrangements between the Adirondack Bob-Sled Association and the State for the conduct of the races seem to have been informal. The State provided the run, sleds, public address system, watchers, maintenance crew, and trucks for transporting sleds, participants and spectators. The club provided starters, clerk and timers. The State collected an admission fee from spectators and the club collected an entry fee from the participants.

The exact time of claimant's accident, although a significant point under the particular circumstances, was never definitely established. Claimant thought it occurred between 11:00 and 11:15 A.M., and two crew members agreed substantially. One spectator placed it at 10:30, and another at or before 11:00 o'clock. In the light of other facts to be developed, we believe the spectators were more nearly correct, and that the accident occurred before 11:00 A.M.

Also of importance was the temperature at the time of the accident. Claimant thought it was 20 degrees above zero, one teammate agreed and two teammates testified that it was

freezing. Three spectators said it was between 15 and 20 degrees, four others and the State truck driver said it was freezing, and Dr. Bergamini stated that it was cold. None of these persons examined a thermometer. Superintendent Tallman and District Forester Petty, State employees, had both examined thermometers earlier in the day and on that basis, and assuming a small rise in the course of the morning, testified that the temperature was from 34 to 36 degrees above zero. This latter testimony, being the only evidence based on actual thermometer observation is entitled to weight, as against recollections based on mere estimate or guess. Considering this, but also considering that no thawing was observed, we conclude that the actual temperature was in all probability just about at the freezing point, or around 32 degrees.

The next major problem is the matter of time lapse between the accident and the admission of the claimant to the hospital. The claimant and one teammate say that the claimant lay in the snow about 20 minutes before he was removed to the truck. Another teammate puts it at 10 minutes. Four spectators thought it was 20 minutes or more. The truck driver placed it at 10 to 12 minutes, the district forester at 9 to 10 minutes, and Dr. Bergamini, a spectator, who reached the scene within 2 minutes and supervised the placement of the injured contestants on stretchers and on the trucks, stated that only 5 minutes elapsed, with which estimate Superintendent Tallman apparently agreed. In view of the fact that the stretchers and blankets were produced promptly from the nearby watcher's booth at Zig-Zag Curve, and that the truck came down to the scene quickly, we believe the actual elapsed time was not more than 10 minutes. The time would very naturally seem longer to the victims and to excited onlookers.

The dump truck upon which the claimant and teammate Dewey were placed reached the vicinity of the clubhouse, near the finish of the run, in about 5 minutes. There is dispute as to the time taken in transferring the two to the pickup truck, the testimony ranging from 2 to 10 minutes. The maximum, we think, was 3 minutes.

Likewise, there is a discrepancy as to the time of the seven-mile run to the hospital. The claimant thinks it was from 25 to 30 minutes, the driver from 15 to 20 minutes, Superintendent Tallman, 15 minutes, and Dr. Bergamini, who followed in another truck, 10 to 15 minutes. At the most, 20 minutes seems the reasonable time.

Finally, there was some delay in actual admittance to the hospital, with the testimony ranging from 5 to 10 minutes, and the more likely period being 5 minutes.

Our conclusions total 43 minutes, which we feel is maximum, with 40 minutes the most probable elapsed period from the time of the accident to time of hospital admission. The hospital record, which was not successfully disputed, shows the admission of claimant at 11:25 A.M. Thus it now appears that the accident must have occurred before 11 o'clock unless the elapsed time from accident to hospital was substantially less than even the minimum of about 30 minutes which the State asserts. Certainly it could not have been a full hour, as claimant contends, since the races did not begin until 10:30 that morning.

The claimant complains also that he was covered only with a thin blanket with a large hole in it, which did not cover his feet and was entirely inadequate protection against the cold. He was dressed in wool gabardine ski pants, fur-lined jacket, two pairs of socks, one pair being of heavy wool, and leather-topped rubbers or boots. The left boot was removed immediately after the accident, because the foot had begun to swell and pain, and was not replaced. The blanket was a part-wool part-cotton affair weighing about five pounds. Other witnesses think it covered the claimant fully and did not observe the hole. Thus, it appears that claimant was warmly dressed and had some extra covering. Its adequacy is difficult to assess, but it must be borne in mind that all four of the crew were injured so that the available blankets had to be apportioned and could not be concentrated on the claimant alone.

When the claimant was admitted to the hospital he was found to be pallid, shivering, with weak, rapid pulse, in generally poor condition, and in much pain; in short, suffering from profound shock. His leg, like the rest of his body, was cold and almost lacked pulsation, but there was no evidence of stoppage of circulation through injury to blood vessels. X rays were taken and disclosed four or five fractures of the left leg, all in perfect alignment. A cast was immediately applied, underlaid with a wadding and felt. Hot-water bottles were also applied to overcome his coldness and weak circulation. After three or four days the leg was found to be still cold and upon palpation no pulsation was apparent. This condition continued and on the seventh day incipient gangrene was noted, which in the course of time developed and spread until amputation became inevitable.

Obviously, a vital issue is whether or not the exposure to which the claimant was subjected caused the continued failure

of circulation in his leg and the gangrene. The claimant's attorney submitted this issue, in the form of a hypothetical question, to three physicians, Dr. Owens, the original attending physician, and Drs. Volpert and Geis, who had acted as consultants, and each testified, in substance, that such exposure caused, or at least greatly aggravated, the condition. There is a very serious difficulty with this testimony, however. The hypothetical question assumed that the temperature was only 20 degrees above zero; that claimant lay in the snow 20 minutes before removal, and that he lay in the truck outside the hospital from 15 to 20 minutes before actual admission. We have found that he lay in the snow not more than 10 minutes; that the temperature was about 32 degrees, and that there was not more than 5 minutes' delay at the hospital. Thus the actual facts vary so materially from the assumed facts that these medical opinions become of little value. In the absence of more satisfactory evidence we are unable to find definitely that the exposure was the cause, or even a significant aggravation, of the failure of circulation.

It is equally possible that the restriction of circulation resulted from a tight cast. Dr. Owens' own entry in the hospital record shows that the leg was swollen and the cast tight on February 12th, three days after claimant's admission to the hospital. The claimant's mother, a registered nurse, testified that he could not stand the cast. It was in fact removed on February 13th. Dr. Bergamini, who later replaced Dr. Owen as attending physician, and who performed the amputation, testified that gangrene has been caused by a tight cast. Again, however, the evidence is too slender to justify a definite conclusion as to the actual cause in this case.

It is also possible that the failure of circulation was simply a result of the severe shock accompanying the severe injury. There is medical testimony from which this might be inferred, although nothing sufficiently conclusive to support a definite finding. It is a fact that claimant's general condition was very poor following the accident and that for some time his survival was uncertain.

We can only conclude, therefore, that there is a lack of proof as to the true cause of the failure of circulation and gangrene. Any other finding would, on this record, be open to most serious question.

Shortly after his admission to the hospital, the claimant developed pneumonia which persisted for ten days or more.

There is testimony, based on the same hypothetical questions described above, that this was also a result of cold and exposure, but, as above shown, the value of this testimony is dubious because it was based on assumed facts which we have found to be erroneous.

One of the principal contentions of the claimant is that the State should have provided at the races an ambulance or other heated vehicle for the transportation of injured persons. Indeed, the claimant suggests that in prior years the State had done so and had also provided a physician or nurse or both. The suggestion is misleading. The records clearly show that the State had never undertaken such responsibility. Prior to the March, 1942, closing of the run, the Adirondack Bob-Sled Association did do so, however. For a period of five or six years, through the 1941-42 season, it had regularly arranged for the presence at racing meets of a doctor, a nurse, and an ambulance or other covered vehicle. Usually, the ambulance was provided by the claimant's father, Matthew B. Clark, Sr., and claimant had accompanied the ambulance on some of those occasions.

Evidently, the association failed to make the same arrangements upon the reopening of the run for the 1945-46 season; in any event it had not provided, and there was not present on February 9, 1946, any ambulance, other covered vehicle, doctor or nurse (except that Dr. Bergamini chanced to be present as a spectator). At some point in the season the practice must have been resumed, for in October, 1946, the association adopted a resolution thanking Mr. Clark, Sr., for providing an ambulance at the races " last season ".

This brings us to consideration of the law applicable to the facts thus developed. Neither claimant's nor the Attorney-General's nor our own research has revealed any precedent precisely in point, but we do find certain established principles from which a decision may be reached.

The first principle is that denominated " volenti non fit injuria " — he who consents cannot receive injury. One who takes part in a sport accepts the dangers that inhere in it insofar as they are obvious and necessary. (*Murphy* v. *Steeplechase Amusement Co.*, 250 N. Y. 479, and cases and authorities therein cited; *Lumsden* v. *Thompson Scenic Ry. Co.*, 130 App. Div. 209.)

The claimant had participated in bobsledding on the Mt. Van Hoevenberg run since December, 1945, and had received certificates of competency. He had followed the sport for some years previously, had been at races with his father's ambulance as early as 1940, and had participated in bringing injured per-

sons from the run. He admittedly knew that bobsled racing was a dangerous sport. He knew that there had been accidents resulting in injuries requiring transportation of the victims to the hospital. There can be no doubt that he assumed the risk attendant upon participation in the sport. In this case, considering the great speed and momentum of the heavy racing bobsleds, and the severe curves which they must negotiate, there was obviously risk of serious mishap, severe injury, possibly even of death.

Furthermore, the claimant knew that his father, ordinarily the only one to provide an ambulance, had no ambulance present that day. He knew, too, the weather conditions and distance to the hospital, and must be presumed to have known that there would necessarily be involved in any accident requiring hospitalization some amount of preliminary exposure to cold. It must also be presumed that he would know, as would any person of normal experience and observation, that injuries sometimes involve complications in the form of infection or otherwise.

The foregoing bears, of course, on the question whether the claimant assumed not only the risk of the original accident but also the risk of the later complications and consequences. A person responsible for an injury " must respond for all damages resulting directly from and as a natural consequence of the wrongful act according to common experience and in the usual course of events, whether the damages could or could not have been foreseen by him." (*Steitz* v. *Gifford,* 280 N. Y. 15, 20.) This applies to aggravation of injuries through an error in treatment by a physician. (*White* v. *Matthews,* 130 Misc. 301, revd. on other grounds, 221 App. Div. 551, and through a second accident, *Matter of McNaught* v. *Louris Amusement Corp.,* 270 App. Div. 100; 7 Warren on Negligence, pp. 26, 28.) While we find no case so asserting, we believe the converse is also true, namely that one who assumes the risk of injury assumes also the risk of consequential injuries or damages, whether or not he could have foreseen them. In this case severe shock, some exposure to cold, some delay in hospitalization, possible error in treatment, were natural consequences of the severe injury and of the situation. We believe that failure of circulation in the badly injured leg, and the resulting gangrene, while certainly uncommon results, were still direct and natural consequences of the injury, shock and other factors. (*Poplar* v. *Bourjois, Inc.,* 298 N. Y. 62.) They were included in the risk assumed, even though of course unforeseen.

The claimant concedes that the State violated no duty so far as the original accident is concerned. This being so, the State's subsequent position is most closely analogous to that of the volunteer, who, in no way responsible for the original accident, injury or occurrence, assumes the care of an injured person. It is now well established that such a volunteer is charged with a duty of common or ordinary humanity to provide proper care and attention so that at least the injured party is made no worse. The cases giving rise to this proposition are collected in annotations in 5 American Law Reports 513 and 120 American Law Reports 1525, and the subject is also covered in 38 American Jurisprudence (Negligence, § 17). Unreasonable delay in securing medical attention for an injured person of whom one has taken charge can constitute a violation of this duty. (*Middleton* v. *Whitridge*, 213 N. Y. 499; *Zelenko* v. *Gimbel Bros.*, 158 Misc. 904, affd. 247 App. Div. 867.)

We do not find any breach of this duty by the State in the present case. It promptly produced stretchers and blankets, and under the supervision of a physician, Dr. Bergamini, placed claimant and his teammates thereon, covered them, removed them with reasonable expedition to a vehicle, and transported them to a hospital without undue delay. Dr. Bergamini testified that " As quickly as possible they were moved with as much care and gentleness on to the litters, covered with the blankets, and put on the trucks ". The case is very different from *Middleton* v. *Whitridge* (*supra*) where a streetcar passenger, observed to be increasingly ill, was nevertheless carted about town for several hours before he was finally turned over to the police, by then in a dying condition. It is also very different from *Zelenko* v. *Gimbel Bros.* (*supra*) where an ill customer was segregated for six hours in the defendant's infirmary, unable to secure and not furnished any medical attention. And in neither of those cases was the issue finally resolved, for the actual decision in both cases was in effect to leave the question of negligence to the jury.

In *Plutner* v. *Silver Associates* (186 Misc. 1025) a patron of a bathhouse fell, evidently through no fault on the part of the proprietor, and afterward, feeling ill, asked an attendant to help him upstairs so that he might secure medical attention. He was requested to wait, but ventured up the steps alone and again fell. He brought action for the injuries sustained in the second fall on the ground that they resulted from failure to furnish aid and assistance. His complaint was dismissed after trial, the

court holding that there was no duty to render aid and in any event there was no such " continued heedlessness " as in the *Middleton* case *(supra)*.

In *Warren* v. *Werther* (182 App. Div. 783, affd. 228 N. Y. 537) a patron of a Turkish bath, burned when he became unconscious, contended on appeal that the proprietor was negligent in failing to provide any medical attention. The court, in overruling this contention, said (p. 787) " But there is no proof in the case that the injuries were in any way aggravated by the tardiness of the medical attendance nor in fact does the record justify even an inference that the plaintiff was not furnished with medical attendance as soon after he was removed from the hot room as was possible."

In the light of the foregoing decisions, involving, it will be noted, injured patrons, we feel that the State did well by the claimant, who, unlike the race spectators, was not its patron.

The claimant, of course, contends that in view of the known danger of accidents, its control of the grounds, and its interest in the races, which attracted paying customers, the State owed a higher degree of care to the race participants than was necessary in the cases above cited. In particular, he urges that there should have been present an ambulance or other heated vehicle suited to the same purpose, and he places considerable reliance on the fact that not only such a vehicle but also a doctor and nurse had been present in other years. We are compelled to disagree. While unquestionably the State remained in control of the run and the grounds, the races were conducted by the association, which determined the participants, received their fees, and had in previous years assumed responsibility for provision of medical attendance and hospital transportation for their protection. It was an established arrangement and legally sufficient, for the State owed the participants no further duty than the provision of a properly maintained run, which it did, and of reasonable care if it assumed charge of them when injured. It did not have to provide an ambulance, physician and nurse simply because the association had theretofore done so, and indeed it may well have been justified in assuming that the association would continue to do so. Its duty to spectators necessitated no such precaution, and on racing days it carried no passengers on State sleds for whom any such provisions might be deemed necessary.

The net result is that the claims are barred on any and all of three grounds: first, failure of proof that the alleged delay and

exposure caused the unfortunate complications from which the claimant suffered; second, assumption of the risk; third, full and adequate discharge of the State's duty to the claimant after the original accident. The claim must therefore be dismissed.

Findings of fact and conclusions of law may be submitted within ten days after the filing of this memorandum, otherwise this opinion will be considered the decision.

Let judgment be entered accordingly.