John J. DUNION, Jr.

v.

Frederick KAISER, Barbara Kaiser and Frederick Kaiser Products, Inc.

No. 289.

United States District Court
E. D. Pennsylvania.

Sept. 21, 1954.

Freedman, Landy & Lorry, Philadelphia, Pa., for libellant.

Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for respondents.

CLARY, Judge.

This is a suit in admiralty brought by the owner of a motorboat, the "Jay Dee", for damages caused to the boat in a collision occurring in the course of a power-boat race. This opinion will state the Court's Findings of Fact and Conclusions of Law in narrative form since separate and numbered findings would be cumbersome and lengthy to a degree not warranted or necessary to a proper disposition of the action.

Libellant's motorboat was a twenty-two foot runabout, the engine of which had been altered and tuned to gain maximum racing performance. In the race involved and at the time of the collision, the boat was being driven by libellant's son, John J. Dunion, III, accompanied by an observer-assistant, as is usual in such cases, designated in powerboat racing terms as a "mechanic". The other boat involved in the collision was a similar twenty-two foot runabout, the "Captain Rocking Chair II", owned by respondent corporation and driven by one of the individual respondents, the then Barbara Kaiser (now Barbara Kaiser Henderson). The role of "mechanic" for this boat was being filled by the driver's father, Frederick Kaiser, who also has been made a respondent in the libel.

The race was run on the afternoon of July 29, 1950, in Great Egg Harbor Bay off Ocean City, New Jersey. The course was marked by two buoys approximately a mile and a quarter apart. The entrants were required to proceed in a counter-clockwise direction from a starting line near one buoy, to round the far buoy and return. The track of the boats around the course would therefore trace an ellipse. Five boats were entered in the race, only two of which are in anywise involved in this action. The boats, by racing rules and custom, were required to proceed each in one of five previously assigned "lanes", all of which were parallel and the centers of which were in this case about fifteen feet apart. Each boat ordinarily remained in its starting "lane" unless it could advantageously move to another "lane" without interfering with or endangering any other boat. These "lanes" were not marked in any way and after the start of the race the exact position of any particular boat in any given "lane" was fixed only by the judgment of the drivers as to where the "lane" should lay.

At the start of the race here involved libellant's boat had been assigned to and proceeded in the outside "lane". This was the most disadvantageous position from the standpoint of distance to be traveled to complete the race. The Kaiser boat was in the next adjoining inside "lane" and the other three boats occupied the next three inside "lanes". The boats of libellant and respondents outstripped the other three boats on the first straightaway after the start and as the far buoy was approached the stern of Dunion's boat was about a boat length ahead of the bow of the one driven by Barbara Kaiser. Both boats had moved somewhat toward the inside of the course but were on parallel courses and in adjoining "lanes", Dunion still being outside of the other boat's projected track and leaving about eight feet of open water between their respective courses. As young Dunion reached a point on a line drawn through the buoy being rounded and perpendicular to the axis of the course he began his turn to the left. His boat was at that time about twenty-five feet from the buoy and moving at thirty-five miles per hour. The Kaiser boat began its turn at about the same speed upon reaching the same line but was not successful in maintaining a smaller arc inside that being described by the "Jay Dee". The two collided at a point on a

line extending from one drawn between the two buoys or about in the middle of the turn. The angle of collision was about forty-five degrees, the bow of the Kaiser boat staving in the hull of Dunion's boat slightly abaft of 'midships on the port side. Dunion drove his boat in a sinking condition to a nearby dock from which place it was later salvaged and repaired. The Kaiser boat was undamaged by the collision. Libellant alleges fault arising from want of skill and ability on the part of Barbara Kaiser and unseaworthiness in that the Kaiser boat at the time of the race had a cracked rudder stuffing box casting which imparted poor steering characteristics to the Kaiser boat and which defect respondents had reason and opportunity to know about and correct.

The hull and engine of the "Jay Dee" had been purchased new for $4,376.88 or $2,846.88 for the hull and $1,530.00 for the engine. Its estimated worth before the collision was $3,400. Repairs to the engine cost $138.04 and to the hull $1,097.50. After repair the engine was worth $1,200.00 which is exactly what it would have been worth at that time had it not been submerged. A new engine worth $1,530.00 was installed in the repaired hull and the whole sold for $3,500.00 of which amount $1,970.00 was involved as the cost of the hull. The proceeds of this sale were $100.00 more than libellant's expert's estimate of its worth before the collision but the new engine was worth $330.00 more than the old. Libellant's loss was therefore the cost of repair, or $1,235.54 plus $230.00, or $1,465.54. The repaired engine was retained by libellant and, as aforesaid, did not suffer in value by reason of its submersion and repair. As a matter of fact, Dunion went on to win a National Championship in a similar boat powered by the identical engine.

There is no convincing evidence before me in this case that Barbara Kaiser's skill and ability as a speedboat driver fell below that level of attainment usually accepted of contestants in that boat race or others of like nature conducted under the same auspices. She had participated in other similar races with the same general community of powerboat enthusiasts, as had young Dunion. There is no indication that Dunion made any protest before the event to the officials conducting the race with regard to her participation in the race or qualifications to do so. It is undisputed that she was attentive to the guidance of the boat and used her best efforts to turn the boat sharply enough to avoid the collision, but was unable to do so. There was testimony that her stature did not permit her feet to readily reach the deck of the boat while she was seated in the driver's seat. Also there was testimony that her boat had been equipped at various times with a foot rest to correct this condition. While it does not appear conclusively whether or not this device was in use when the collision occurred, neither does it appear that its absence in any way affected her ability to control the boat or did more than make her less comfortable.

It is abundantly clear from the record that the Kaisers were solicitous of the mechanical condition and the maintenance of the performance qualities of their boat. They had, previously to the summer of 1950, owned and operated another boat with a hull identical to that of the "Rocking Chair II" but with an engine slightly smaller and less powerful. Barbara had successfully operated this boat and was satisfied by its performance. She was of the opinion that the new boat steered with more difficulty and did not respond as quickly to the helm as the old one had done. The boat was purchased from a local boat yard, which from all that appears in this record was entirely reputable and competently staffed. In response to this observation of Barbara and to have other work done on the boat, Kaiser had placed the boat in the hands of the boat yard owner on a number of occasions during that summer prior to the race in question. The operator of the boat yard, himself a speedboat racer of similar boats, thoroughly tested the boat's steering characteristics under well simulated racing conditions.

**44**

In his opinion and he had so advised the Kaisers, the boat had no mechanical malfunction but handled differently from the former one due to its increased weight and horsepower. The boat was carefully tuned, adjusted, and tested to perform well under racing conditions and the boat was turned over to the Kaisers by the boat yard as fit and ready for the race in question.

■ The cracked rudder stuffing box of which libellant now complains was discovered by the boat yard early in September, many weeks after the collision, the boat having been used constantly in the interval. The cracking of the casting would not of itself make the boat difficult to steer. Such effect would come about and become noticeable only as the bolts which secure the casting to the hull, and which were subjected to an abnormal stress by reason of the cracked casting, were pulled up into the wooden hull and became loosened. This condition would not occur immediately upon failure of the casting but was both progressive and cumulative in effect, the rate of deterioration being dependent upon the amount of use to which the boat was put. When the condition was discovered in September the bolts had been pulled up into the hull planking a distance of three eighths of an inch and said state of disrepair would require over a month to develop as the boat was then being used. Two conclusions are therefore clearly justified from the record. First, that respondents did all that was reasonably possible for them to do to maintain the boat in good mechanical condition and, secondly, that the cracked casting, if in fact it had cracked before or during the race, was then a latent defect, not reasonably discoverable by respondents, and a defect which did not make the boat unsafe to enter in the race.

The record affirmatively establishes that libellant knew or must be charged with knowledge that his boat had been prepared for and participated in powerboat races. Such contests of necessity, and as an incident of the severe performance demanded, subject the hull, engine and fittings of an entrant to stresses approaching the limits of their endurance. The races are not only tests of the skill of the drivers but of the design and materials of the boats, their machinery and fittings. A momentary failure of finely drawn human judgment or of a heavily loaded member or part hazards not only the boat on which it occurs but those necessarily traveling in close proximity to it at high speeds and in water churning with wakes created by those speeds. The precise and sure control required of the boats, if they are to remain in contention, admits of no small error of judgment or cessation of exacting mechanical functioning. That such failures of judgment and imperfections of machines will be revealed from time to time is to be expected rather than to excite surprise. That property damage or personal injury may or may not result cannot be other than fortuitous under the circumstances attending such human or mechanical casualty. Libellant has suffered loss under just such circumstances and here seeks to be made whole.

■■ "Ordinarily, to determine the right and remedies of parties for maritime torts the courts recur to the rules of the common law to ascertain what acts are maritime torts." The Max Morris, C.C., 28 F. 881, 884. There are great numbers of decisions wherein the doctrine of assumption of risk has been invoked as a defense to liability for personal injuries falling under admiralty jurisdiction. Its use in actions arising from maritime collisions is less common but not novel, Jova Brick Works, Inc. v. City of New York, 2 Cir., 1921, 277 F. 180; The Oliver, D.C., 22 F. 848. A search of the reported admiralty cases has revealed none more appropriate for the application of the doctrine of assumption of risk than the instant one. "In its primary and proper sense, it [assumption of risk] means that the plaintiff has consented to relieve the defendant of an obligation of conduct toward him, and to take his chance of injury from a known risk * * * By entering freely and voluntarily into any relation or situation

which presents obvious danger, the plaintiff may be taken to accept it, and to agree that he will look out for himself [and his property], and relieve the defendant of responsibility", Prosser, Torts, Sec. 51, pp. 377, 383. It may be noted in passing that the doctrine has found increasing application against participant and spectator plaintiffs who are injured in the course of sporting events, Rauch v. Pennsylvania Sports and Enterprises, Inc., 367 Pa. 632, 81 A.2d 548; Clark v. State, 195 Misc. 581, 89 N.Y.S. 2d 132; Ingersoll v. Onondaga Hockey Club, Inc., 245 App.Div. 137, 281 N.Y.S. 505.

Libellant, in his brief, has anticipated this defense and argues that he did not assume the risk of damage resulting from negligence, unseaworthiness, or failure to comply with the rules under which the race was run. Assuming, arguendo, that there is sufficient evidence from which fault resulting from negligence of any of the respondents could be found, Prosser, again in Section 51 at page 385, says: "It is also said on occasion * * * that the plaintiff never assumes the risk of defendant's negligence. Such a statement is a confusion in terms: if the plaintiff consents to the risk, there is no duty to him, and hence no negligence."

As has already been stated, if a defect in the "Captain Rocking Chair II" did in fact exist at the time of the race (and this fact is not at all clear in the record) so as to make it unseaworthy, said defect was not discoverable in the exercise of reasonable diligence by respondents. It may also be noted that if the defect then existed it was not of such nature as to affect the safe operation of the boat except possibly in the close quarters and at the high speeds imposed by racing.

Respondents in their answers to interrogatories admit of their belief that the race was run under the rules and auspices of the American Power Boat Association and their testimony confirms the holding of such belief. It may be taken that they therefore considered themselves bound by such rules. Wheth-

er the rules were in fact binding on the parties or not, it does not appear definitely that there was a violation of the rules up until the time and relative positions at which the boats were in extremis. Young Dunion's testimony indicates that he himself may have violated Rule XVI. This rule, which deals with overtaking, provides in part, " * * * the leading boat shall not alter her course so as to compel an overtaking boat to pass within the 10-foot limit." Dunion's own testimony is that his boat was twenty-five feet from the buoy when struck and had been and was continuing on an arc which would keep him that distance from the buoy. Disregarding any restrictive effect of the 15-foot "lanes" and assuming that he meant that the port gunwale rather than the center of his boat was twenty-five feet from the buoy, then in order for the "Captain Rocking Chair II" to pass around the buoy, and yet keep ten feet of clear water between the "Jay Dee" and herself, she would have been required to maintain an arc having a radius of not more than twelve feet (assuming the boats to be at least six feet wide). This means that a twenty-two foot boat would be turning on a twenty-four foot circle at thirty miles per hour or more. Dunion stated that he was not familiar with the provisions of this particular rule.

Libellant having chosen to enter his boat in a racing event in which he knew it would encounter high speed maneuvers in close proximity to other craft operating in rough and confused water must be left to bear the loss which has resulted. He will not be heard to say that he should recover because other drivers were less skillful than his or that other boats were groomed to a lesser degree of mechanical perfection than the "Jay Dee" had been. These facts are precisely what he hoped to demonstrate by having his boat the first to cross the finish line.

As before stated, the Court's Findings of Fact and Conclusions of Law are set forth in the foregoing narrative. An exception is given to each party to the

**46**

extent that the foregoing differs from the requested findings of fact and conclusions of law.

An order will be entered dismissing the libel.