[No. B084053. Second Dist., Div. Five. July 5, 1995.]

ROBERT BARBER, Plaintiff and Appellant, v.
MARINA SAILING, INC., et al., Defendants and Respondents.

560

COUNSEL

Devirian, Utley & Detrick and Brian S. Detrick for Plaintiff and Appellant.

Fisher & Porter and David S. Porter for Defendants and Respondents.

OPINION

**GODOY PEREZ, J.**—Plaintiff Robert Barber appeals from the summary judgment granted for defendants Marina Sailing, Inc., Harold Crum, Mike

Jones, Moore and Associates and Larry Moore. For the reasons set forth below, we reverse the judgment.

## FACTS AND PROCEDURAL HISTORY

Plaintiff and appellant Robert Barber (Barber) is a highly experienced sailor. On August 25, 1992, at the invitation of his girlfriend, Barber boarded the 42-foot sailing ship Angela for a pleasure cruise around the Long Beach Harbor area which was sponsored by the girlfriend's employer, defendant and respondent Moore and Associates. The ship was owned by defendant and respondent Harold Crum and had been chartered by Moore and Associates from defendant and respondent Marina Sailing, Inc. The skipper was defendant Mike Jones.[1]

There had been some discussion about an informal race between the Angela and another boat. Because of Barber's extensive experience, he was asked and agreed to help out as a crewmember. When the Angela was ready to leave the dock, Barber stood at the bow waiting to release the dock lines. Jones, who was at the helm, was busy talking to some women. He engaged the ship's engine in reverse without calling out that he was departing the dock. The maneuver caught Barber unawares, trapping his finger in the dockline and cutting it off. Barber was able to catch his finger before it fell into the water, walked up to Jones and showed him the finger. The record is silent as to whether Barber was able to have the finger surgically reattached.[2]

On January 20, 1993, Barber filed a complaint against respondents for negligence in connection with his injuries. Marina, Jones and the owner brought a motion for summary judgment, contending that as a matter of California law Barber's claim was barred by the doctrine of assumption of the risk. Moore joined in that motion. Barber opposed the motion on the ground that his claim fell within the jurisdiction of federal maritime law, which does not recognize assumption of risk as a defense. Finding that federal law did not govern, the trial court granted summary judgment for respondents under the authority of *Stimson* v. *Carlson* (1992) 11 Cal.App.4th 1201 [14 Cal.Rptr.2d 670] (hereafter *Stimson*), which held that participants

---

[1]Moore and Associates and Larry Moore will be referred to as "Moore." Marina Sailing, Inc., erroneously sued as Marina Sailing Charter Co., will be referred to as "Marina," Harold Crum will be referred to as "the owner," and Mike Jones will be referred to as "Jones." These parties will sometimes be referred to collectively as "respondents."

[2]Respondents ask that we review de novo certain objections made below to portions of Barber's declaration in opposition to summary judgment. Because the trial court made no ruling on those objections, we deem all objections as having been waived and will consider, as the trial court presumably did, all of the evidence set forth in the papers. (*Knight* v. *City of Capitola* (1992) 4 Cal.App.4th 918, 924, fn. 2 [6 Cal.Rptr.2d 874].)

in sailboat races are deemed to have assumed the risk of certain injuries inherent in that activity.

## STANDARD OF REVIEW

Summary judgment is granted when a moving party establishes the right to the entry of judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) In reviewing an order granting summary judgment, we must assume the role of the trial court and redetermine the merits of the motion. In doing so, we must strictly scrutinize the moving party's papers. (*Chevron U.S.A., Inc.* v. *Superior Court* (1992) 4 Cal.App.4th 544, 549 [5 Cal.Rptr.2d 674].) The declarations of the party opposing summary judgment, however, are liberally construed to determine the existence of triable issues of fact. (*Sosinsky* v. *Grant* (1992) 6 Cal.App.4th 1548, 1556 [8 Cal.Rptr.2d 552].) All doubts as to whether any material, triable issues of fact exist are to be resolved in favor of the party opposing summary judgment. (*Ibid.*)

While the appellate court must review a summary judgment motion by the same standards as the trial court, it must independently determine as a matter of law the construction and effect of the facts presented. (*Saldana* v. *Globe-Weis Systems Co.* (1991) 233 Cal.App.3d 1505, 1510-1511, 1513-1515 [285 Cal.Rptr. 385].)

Recent amendments to the summary judgment statute have changed the burden of proof. A defendant moving for summary judgment meets his burden of proof of showing that a cause of action has no merit if that party shows that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to the action. (Code Civ. Proc., § 437c, subd. (o)(2).) Once the defendant does so, the burden shifts back to the plaintiff to show that a triable issue of one or more material facts exists as to that cause of action or defense. In doing so, the plaintiff cannot rely on the mere allegations or denial of his pleadings, "but, instead, shall set forth the specific facts showing that a triable issue of material fact exists . . . ." (*Ibid.*; see *Union Bank* v. *Superior Court* (1995) 31 Cal.App.4th 573, 590 [37 Cal.Rptr.2d 653].)

## DISCUSSION

1. *Federal Maritime Law Applies to This Action*

■ The federal district courts have exclusive jurisdiction of any civil admiralty or maritime case, "saving to suitors in all cases all other remedies to which they are otherwise entitled." (28 U.S.C. § 1333(1).) This "savings

to suitors clause" means that an injured party may have claims arising from a single accident under both federal maritime and state common or statutory law. State remedies under the savings to suitors clause may be pursued in state court or, if there is a basis for federal jurisdiction, in federal court. (*Ballard Shipping Co.* v. *Beach Shellfish* (1st Cir. 1994) 32 F.3d 623, 625-626.) A maritime claim brought in the common law state courts is governed by federal maritime law, however. (*Powell* v. *Offshore Navigation, Inc.* (5th Cir. 1981) 644 F.2d 1063, 1065, fn. 5.) ■ Respondents contend that, under a recent reformulation of the test for admiralty jurisdiction, Barber's claim is not sufficiently related to maritime activities and is simply a negligence claim under California law.

Under traditional rules of admiralty jurisdiction, the mere fact that Barber's injuries occurred on navigable waters would have been sufficient to invoke maritime law.[3] In *Executive Jet Aviation, Inc.* v. *City of Cleveland* (1972) 409 U.S. 249 [34 L.Ed.2d 454, 93 S.Ct. 493] (hereafter *Executive Jet*), the Supreme Court signaled a possible pullback from the traditional rule, holding that an airplane crash in Lake Erie was not within admiralty jurisdiction simply because the plane crashed in navigable waters. Instead, claims arising from airplane crashes were only cognizable in admiralty if the wrong bore a significant relationship to traditional maritime activity. (*Id.* at pp. 268, 274 [34 L.Ed.2d at pp. 467, 270-471].)

In the wake of *Executive Jet*, several courts began to apply its formulation outside the context of aviation torts. (*Foremost Insurance Co.* v. *Richardson* (1982) 457 U.S. 668, 673 [73 L.Ed.2d 300, 305, 102 S.Ct. 2654], hereafter *Foremost*.) This application was expressly approved by the *Foremost* court, which announced a new set of rules for determining the existence of admiralty jurisdiction, regardless of whether the vessels involved were commercial or pleasure craft. *Foremost* arose from a collision between two pleasure craft, one boat towing a water-skier and the other a bass fishing boat. As a result of the collision, one person was killed and his survivors sued the driver of the other boat for negligence. Neither boat had ever been involved in any commercial activity of any kind, nor were they under hire. The federal district court dismissed the action for lack of admiralty jurisdiction but the Fifth Circuit Court of Appeals reversed. (*Richardson* v. *Foremost Ins. Co.* (5th Cir. 1981) 641 F.2d 314.)

---

[3]The admiralty jurisdiction of the United States extends to all waters, salt or fresh, with or without tides, natural or artificial, which are in fact navigable in interstate or foreign commerce. (*Blevens* v. *Sfetku* (1968) 259 Cal.App.2d 527, 531 [66 Cal.Rptr. 486].) Barber contends and respondents concede that the incident at issue here took place on navigable waters for purposes of admiralty jurisdiction. While the incident still must occur on navigable waters, that so-called "locality test" by itself is no longer sufficient to invoke federal admiralty jurisdiction. (*Jerome B. Grubart* v. *Great Lakes Dredge & Dock* (1995) __ U.S. __ [130 L.Ed.2d 1024, 1034-1035, 115 S.Ct. 1043].)

The Supreme Court affirmed, holding that while the wrong involved must have a significant connection with traditional maritime activity, there is no requirement that the maritime activity be exclusively commercial. Because the wrong at issue involved the negligent operation of a vessel on navigable waters, it had a sufficient nexus to traditional maritime activity to sustain admiralty jurisdiction. (*Foremost, supra,* 457 U.S. at p. 674 [73 L.Ed.2d at pp. 305-306].) The court rejected the argument that commercial activity must have been involved in the accident, stressing the need for uniformity in federal maritime law regardless of whether pleasure or commercial craft were involved. The federal interest in maritime commerce could not be adequately protected if admiralty jurisdiction were limited to those actually engaged in commercial activity. Instead, "[t]his interest can be fully vindicated only if *all* operators of vessels on navigable waters are subject to uniform rules of conduct. The failure to recognize the breadth of this federal interest ignores the potential effect of noncommercial maritime activity on maritime commerce. For example, if these two boats collided at the mouth of the St. Lawrence Seaway, there would be a substantial effect on maritime commerce, without regard to whether either boat was actively, or had been previously, engaged in commercial activity. Furthermore, admiralty law has traditionally been concerned with the conduct alleged to have caused this collision by virtue of its 'navigational rules—rules that govern the manner and direction those vessels may rightly move upon the waters.' [Citation.] The potential disruptive impact of a collision between boats on navigable waters, when coupled with the traditional concern that admiralty law holds for navigation, compels the conclusion that this collision between two pleasure boats on navigable waters has a significant relationship with maritime commerce." (*Id.* at pp. 674-675 [73 L.Ed.2d at p. 306], fn. omitted.)

Controlling the existence of admiralty jurisdiction by the status of the boats as pleasure versus commercial craft would lead to inconsistent results, permitting or denying jurisdiction based on fortuitous circumstances such as whether the boat was, or ever had been, rented or used for commercial fishing. In addition to the uncertainty such line-drawing would cause, the court held: "Moreover, the smooth flow of maritime commerce is promoted when all vessel operators are subject to the same duties and liabilities. Adopting the strict commercial rule would frustrate the goal of promoting the smooth flow of maritime commerce, because the duties and obligations of noncommercial navigators traversing navigable waters flowing through more than one State would differ 'depending upon their precise location within the territorial jurisdiction of one state or another.' [Citation.]" (457 U.S. at pp. 675-676 [73 L.Ed.2d at p. 307].)

The court in *Sisson* v. *Ruby* (1990) 497 U.S. 358 [111 L.Ed.2d 292, 110 S.Ct. 2892] (hereafter *Sisson*), refined the *Foremost* holding into a

two-part formula for determining the existence of admiralty jurisdiction. The court must: (1) "assess the general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial activity"; and (2) conclude that there is a "substantial relationship between the activity giving rise to the incident and traditional maritime activity." (*Sisson, supra,* 497 U.S. at pp. 363, 364 [111 L.Ed.2d at pp. 299-300, 300-301].)[4] Under this formula, a fire in the washer-dryer unit of a pleasure boat docked at a marina on Lake Michigan, which destroyed the boat and damaged both the marina and other nearby vessels, fell within the ambit of federal maritime law.

In holding that the first prong—the requisite potential impact on maritime commerce—had been satisfied, the court rejected the contention that the potential impact was negligible because no commercial vessels were docked at the marina when the fire broke out. "This argument misunderstands the nature of our inquiry. We determine the potential impact of a given type of incident by examining its general character. The jurisdictional inquiry does not turn on the *actual* effects on maritime commerce of the fire on Sisson's vessel; nor does it turn on the particular facts of the incident in this case, such as the source of the fire or the specific location of the yacht at the marina, that may have rendered the fire on the [ship] more or less likely to disrupt commercial activity. Rather, a court must assess the general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial activity. Here, the general features—a fire on a vessel docked at a marina on navigable waters—plainly satisfy the requirement of potential disruption to commercial maritime activity." (*Sisson, supra,* 497 U.S. at p. 363 [111 L.Ed.2d at p. 300].)

Instead of a fact specific inquiry, the court confirmed that the potential to disrupt maritime commerce must be considered in the abstract. In *Executive Jet,* for instance, the *Sisson* court noted that the first aspect of the jurisdictional test was satisfied because an aircraft sinking in navigable waters could create a hazard for commercial vessels. Likewise in *Foremost,* even though the two pleasure craft did not impede any commercial ships, the court noted the potential for having done so, postulating what might have occurred had the ships collided at the mouth of the heavily traveled St. Lawrence Seaway. (*Sisson, supra,* 497 U.S. at pp. 363-364 [111 L.Ed.2d at pp. 299-301].)

The focus of the second prong—whether the activity giving rise to the incident bore a substantial relationship with traditional maritime activity—is

---

[4]These two criteria comprise the so-called "connection test" for admiralty jurisdiction, which still requires that the "location test" be satisfied. (*Jerome B. Grubart* v. *Great Lakes Dredge & Dock, supra,* __ U.S. __ [130 L.Ed.2d 1024, 115 S.Ct. 1043].)

not on the cause of the harm and is defined not by the particular circumstances of the incident but by the general conduct from which the incident arose. Accordingly, the relevant activity at issue in *Sisson* "was the storage and maintenance of a vessel at a marina on navigable waters." (*Sisson, supra*, 497 U.S. at pp. 364-365 [111 L.Ed.2d at p. 301], fn. omitted.) The navigation at issue in *Foremost* was only one example of traditional maritime activity and a narrow focus on navigation "would not serve the federal policies that underlie our jurisdictional test. The fundamental interest giving rise to maritime jurisdiction is 'the protection of maritime commerce,' [citation], and we have said that that interest cannot be fully vindicated unless '*all* operators of vessels on navigable waters are subject to uniform rules of conduct,' [citation]. [Italics in original.] The need for uniform rules of maritime conduct and liability is not limited to navigation, but extends at least to any other activities traditionally undertaken by vessels, commercial or noncommercial. [¶] Clearly, the storage and maintenance of a vessel at a marina on navigable waters is substantially related to 'traditional maritime activity' given the broad perspective demanded by the second aspect of the test. *Docking a vessel at a marina on a navigable waterway is a common, if not indispensable, maritime activity. At such a marina, vessels are stored for an extended period, docked to obtain fuel or supplies, and moved into and out of navigation. Indeed, most maritime voyages begin and end with the docking of the craft at a marina.* We therefore conclude that, just as navigation, storing and maintaining a vessel at a marina on a navigable waterway is substantially related to traditional maritime activity." (*Sisson, supra*, 497 U.S. at pp. 365-367 [111 L.Ed.2d at pp. 301-302], italics added.)

■ Respondents concede and we have no trouble concluding that Barber has satisfied the second prong of the *Foremost* test: the relevant general activity involved was the release of dock lines as the ship got underway, an activity which is substantially related to traditional maritime activity. As the *Sisson* court noted, docking is a common, if not indispensable, maritime activity and most voyages begin and end with the docking of a craft. By parity of reasoning this necessarily subsumes the act of undocking and the necessary precautions which a skipper or pilot must follow to do so safely for the sake of both passengers and crew. (See *Oman* v. *Johns-Manville Corp.* (4th Cir. 1985) 764 F.2d 224, 230 ["To be in admiralty the plaintiffs must have been doing what sailors normally do . . . ."]; cf. *Foster* v. *Peddicord* (4th Cir. 1987) 826 F.2d 1370, 1376 [pleasure boat passenger injured from diving into water from boat, which was anchored away from shore; "Reduced to its essence, this case is about swimming and diving . . . . It is not about piloting, shipping, or navigational error, or other aspects of traditional maritime activity."].)

Respondents contend that Barber cannot satisfy *Foremost*'s first prong, however, since the release of dock lines only posed a threat of injury to one

person and Barber did not produce evidence to show any potential adverse impact on commercial maritime activity.

We believe this argument misunderstands the nature of our inquiry here. First, respondents bear the burden of introducing sufficient facts to make out their defense. Only then would the burden switch, requiring Barber to produce contrary evidence. (Code Civ. Proc., § 437c, subd. (o)(2).) Second, the determination we are called on to make is not fact specific. We determine the potential impact on maritime commerce by examining the general character of the incident. Knowing that, it is for the court to assess the general features of the type of incident to decide whether such an incident has the potential to disrupt commercial activity. In doing so, we do not consider the actual effects of the incident on maritime commerce. (*Sisson, supra,* 497 U.S. at p. 363 [111 L.Ed.2d at pp. 299-300]; see *Great Lakes Dredge & Dock Co.* v. *City of Chicago* (7th Cir. 1993) 3 F.3d 225, 230, fn. 7, affd. in *Jerome B. Grubart* v. *Great Lakes Dredge & Dock, supra,* __ U.S. __ [130 L.Ed.2d 1024, 115 S.Ct. 1043] [when the incident at issue has not actually disrupted maritime commerce, the court must engage in a "*counterfactual analysis*" and decide whether the general features of the accident were likely to disrupt commercial activity].)

In short, once the court possesses enough information about the type of incident involved to determine its general character, it is up to the court to assess that character and decide in the abstract whether it was likely to disrupt commercial maritime activity. This comports with the reviewing court's role on summary judgment: we examine the facts independently and determine their effect as a matter of law. (*Pender* v. *Radin* (1994) 23 Cal.App.4th 1807, 1813 [29 Cal.Rptr.2d 36].)

We find the decision in *Emery* v. *Rock Island Boatworks, Inc.* (C.D.Ill. 1994) 847 F.Supp. 114 to be dispositive. The plaintiff in *Emery* was a passenger on the Casino Rock Island. She was injured when she fell eight feet through an open manhole/scuttle hole located in an aisle or walkway for boat passengers. The defendant boat owner brought a motion to dismiss or for summary judgment on the ground that the incident did not pose a potential hazard to maritime commerce, thus defeating admiralty jurisdiction. In denying those motions, the court held: "In looking at the general features of this incident, the occurrence could potentially threaten maritime commerce. For example, suppose the pilot or other essential crew member had a similar mishap while piloting the vessel within the channel of the Mississippi River. Even where a passenger is involved, as here, a personal injury aboard the vessel caused by the negligence of its owner carries the potential of necessitating extraordinary rescue measures affecting commerce

on the River. In addition, this Court is convinced that the type of recreational activities occurring on the vessel involved in this litigation constitutes maritime commerce independent of barge or other commercial traffic on the River." (*Id.* at pp. 115-116.)[5]

The type of incident involved here—a skipper or pilot who moves his ship away from the dock without warning those on board casting off the dock lines—also poses a potential hazard to commercial maritime activity. While Barber lost a finger as a result of the incident, another crewman or passenger could have just as easily entangled a hand or arm or even been dragged overboard, thus requiring rescue efforts which would have impeded commercial activities at the dock. (Accord, *Complaint of Kanoa, Inc.* (D. Hawaii 1994) 872 F.Supp. 740, 745 [while scuba diving accident was not substantially related to traditional maritime activities, calling for boats to assist with rescue efforts did potentially disrupt maritime commerce].) Had the dock lines remained attached to the boat due to Moore's failure to warn, it is easy to imagine damage being done to the ship or the dock, also disrupting maritime commerce. These potential disruptions would only be magnified had the Angela been engaged in commerce at the time.[6] Based on the facts presented by respondents and our assessment of those facts, we hold as a matter of law that Barber's injuries arose in the context of federal maritime jurisdiction and his claim is governed by federal maritime law. (Accord, *Chan* v. *Society Expeditions, Inc.* (9th Cir. 1994) 39 F.3d 1398, 1403, fns. 5, 6, and 7.)

## 2. *Assumption of The Risk Is Not a Defense in Admiralty*

Although the common law originated in the customs on land, maritime law derives from customs at sea and therefore constitutes a separate and distinct body of law. Only when there are no clear precedents in the law of the sea may courts look to the law prevailing on the land. (*Floyd* v. *Lykes Bros. S.S. Co., Inc.* (3d Cir. 1988) 844 F.2d 1044, 1046.)

Numerous federal cases have held in a variety of contexts that assumption of the risk is not permitted as an affirmative defense in admiralty law. Instead, it is deemed a species of contributory negligence which may diminish a plaintiff's recovery in proportion to his share of comparative fault but will not bar recovery in whole. (*Socony-Vacuum Co.* v. *Smith* (1939) 305

---

[5]It is unclear from the decision what type of recreational activities the Casino Rock Island was engaged in, but based on the ship's name, we presume it was a gambling ship.

[6]Further, since the Angela was a chartered pleasure boat, it was arguably engaged in maritime commerce at the time. (*Great Lakes Dredge & Dock Co.* v. *City of Chicago, supra,* 3 F.3d at p. 228, fn. 4; *Emery* v. *Rock Island Boatworks, Inc., supra,* 847 F.Supp. at pp. 115, 116.)

U.S. 424, 431 [83 L.Ed. 265, 271, 59 S.Ct. 262] ["Any rule of assumption of risk in admiralty, whatever its scope, must be applied in conjunction with the established admiralty doctrine of comparative negligence and in harmony with it. Under that doctrine contributory negligence, however gross, is not a bar to recovery but only mitigates damages."]; *The Arizona* v. *Anelich* (1936) 298 U.S. 110, 122 [80 L.Ed. 1075, 1080, 56 S.Ct. 707] ["no American case appears to have recognized assumption of risk as a defense to" suits arising under the Jones Act, 46 U.S.C. § 688,[7] or to pre-Jones Act suits based on a ship's unseaworthiness]; *Beadle* v. *Spencer* (1936) 298 U.S. 124, 129 [80 L.Ed. 1082, 1084, 56 S.Ct. 712]; *Edward Leasing Corp.* v. *Uhlig & Associates, Inc.* (11th Cir. 1986) 785 F.2d 877, 886 ["The assumption of the risk defense is not a bar to recovery in admiralty."]; *Nat. Marine Service Inc.* v. *Petroleum Service Corp.* (5th Cir. 1984) 736 F.2d 272, 276-277; *Gemp* v. *United States* (6th Cir. 1982) 684 F.2d 404, 408-409; *Skidmore* v. *Grueninger* (5th Cir. 1975) 506 F.2d 716, 727 [pleasure boat passenger killed in collision with barge; assumption of risk not applicable in maritime cases where seamen are not involved]; *DuBose* v. *Matson Navigation Company* (9th Cir. 1968) 403 F.2d 875, 877 ["assumption of risk has no place in maritime law . . . ."]; *Movible Offshore Company* v. *Ousley* (5th Cir. 1965) 346 F.2d 870, 873-874; *The Seeandbee* (6th Cir. 1939) 102 F.2d 577, 581-582; *King* v. *Testerman* (E.D.Tenn. 1963) 214 F.Supp. 335, 336 [water-skier suing tow boat operator not barred since "admiralty law does not recognize the assumption of risk doctrine . . . ."].)

Respondents rely on a handful of cases dealing with boat-race collisions to contend that admiralty law in this area either permits the assumption of risk defense or is so unsettled that California law on the subject should apply.[8] The court in *Dunion* v. *Kaiser* (E.D.Pa. 1954) 124 F.Supp. 41, 44-45 (hereafter *Dunion*), held that the owner of a motorboat damaged in a collision with another boat during an organized race was barred from seeking damages because he assumed the risk of such a collision by taking part in the race. In reaching this result, the *Dunion* court relied on two decisions—*Jova Brick Works* v. *City of New York* (2d Cir. 1921) 277 F. 180 and *The Oliver* (E.D.Va. 1885) 22 F. 848. These two decisions predated all of the above cited decisions holding that assumption of risk is not a defense

---

[7]The Jones Act governs the rights of merchant seamen injured on the job and the concomitant liabilities of their employers.

[8]California law recognizes two kinds of assumption of risk: primary assumption of risk, in which the defendant owes no duty to protect the plaintiff from a particular risk of harm, regardless of whether the plaintiff's conduct in undertaking the risk was reasonable or not; and secondary assumption of risk, where the defendant does owe the plaintiff a duty of care but the plaintiff acted unreasonably in encountering a known risk of harm. The former acts as a complete bar to recovery while the latter is treated as a species of comparative fault, which acts to reduce a plaintiff's recovery. (*Stimson, supra,* 11 Cal.App.4th at p. 1205.)

in admiralty law. Both are tenuous authority at best for the holding in *Dunion* since they referred to assumption of risk rather loosely, equating it with the defendant's negligence as a cause of plaintiff's injuries rather than an affirmative defense based on a true assumption of the risk by the plaintiff.[9]

*De Sole* v. *United States* (4th Cir. 1991) 947 F.2d 1169 (hereafter *De Sole*), involved an action by the owner of a private yacht for damages sustained from a collision during a race with a United States Navy sailboat. The district court granted the Navy's motion to dismiss on the ground that the plaintiff had assumed the risk of the collision by virtue of his participation in the race. Because the court of appeals preferred not to decide whether assumption of risk was a viable defense unless it had to, it remanded the case to the district court to determine whether the defense could be obviated by the presence of facts showing gross negligence or recklessness by the Navy ship. (*Id.* at pp. 1177-1179.)

Even so, the *De Sole* court discussed both *Dunion* and the assumption of risk doctrine at length, strongly indicating that should it be necessary to reach the issue it would hold that the defense was not available. "The tenets of admiralty law, which are expressly designed to promote uniformity, do not permit assumption of risk in cases of personal injury whether in commercial or recreational situations. Indeed, admiralty law has been credited as giving birth to the idea of comparative negligence. [Citation.]" (*De Sole*, *supra*, 947 F.2d at pp. 1174-1175.) With the possible exception of a racing participant who had expressly agreed in writing beforehand not to sue in negligence for damages caused by a collision, the court said if it were obliged to "decide flat out whether assumption of risk applies to a yachting race on the high seas . . . the majority would be disposed to hold that there is ordinarily no assumption of risk doctrine applicable to collisions between contestants in a maritime race of the nature here presented." *Dunion*, the *De Sole* court noted, was the only known decision to hold that a sporting event

---

[9]The plaintiff (libelant) in *Jova Brick Works* chartered its brick barge to the City of New York and sued the city when the barge was damaged in a collision. The city had left the barge moored for several days while waiting to complete dredging operations. An incoming tow swung off course into the brick barge, sinking it. The court ruled that if the city had promptly unloaded the barge instead of leaving it moored, the accident would not have happened. "It preferred, for its own convenience, to leave the boats where they were, and in doing so assumed the risk, and must be held in fault." (*Jova Brick Works* v. *City of New York, supra*, 277 F. at p. 182.) The defendant (respondent) in *The Oliver* had anchored his schooner at night in a known path of incoming vessels without posting an anchor light. Another ship collided with the anchored vessel and the defendant was found liable for damages. In so holding, the court observed that the defendant, by anchoring where he did without an anchor light, "took all the risks of accidents which might happen through his fault." (*The Oliver, supra*, 22 F. at pp. 849, 851.)

in which admiralty jurisdiction is invoked triggers the assumption of risk defense. *Dunion* had never been cited for the same proposition again and the authorities it relied on "have long since been overruled by the Supreme Court . . . ." (*De Sole, supra,* 947 F.2d at p. 1172, fn. 2.)

The court in *Manning* v. *Gordon* (N.D.Cal. 1994) 853 F.Supp. 1187, 1187-1188 (hereafter *Manning*), noted prior decisions which barred assumption of risk as a defense in the maritime context. Relying on the dicta in *De Sole,* the district court held that the doctrine was also inapplicable in actions arising from collisions between boats involved in yacht racing. (*Manning, supra,* 853 F.Supp. at pp. 1188-1190.) Five months later, the court in *Whalen* v. *BMW of North America, Inc.* (S.D.Cal. 1994) 864 F.Supp. 131 (hereafter *Whalen*), considered whether assumption of risk might be a viable defense where the plaintiff, suing for injuries sustained from a boat-race collision, expressly agreed in writing beforehand that he had assumed all such risks. Noting the *De Sole* court's discussion of this issue, the court said "the applicability of the assumption of risk doctrine to the circumstances of this case remains an open issue." (*Whalen, supra,* 864 F.Supp. at p. 133.)[10] Because the plaintiff had expressly agreed in writing beforehand to assume any risk of injury from participation in the race, the court ruled that the defense was viable under the exception mentioned in *De Sole.* (*Whalen, supra,* 864 F.Supp. at p. 134.)

As discussed above, the general rule in federal maritime law precludes the assumption of risk defense. The most that can be derived from the boat-racing decisions which respondents cite is an evolving exception to that general rule for damages caused by boat-race collisions. *Dunion, supra,* as demonstrated by our own analysis and that of the court in *De Sole,* has limited if any precedential value. Even if it were valid precedent, it would not apply here since Barber's injuries did not occur during a boat-race collision. While there was some evidence that an informal race was planned between the Angela and another ship, Barber's injuries occurred during the act of casting off dock lines, an activity which all ships, regardless of their nature, must perform. *De Sole, Manning* and *Whalen* at most stand for the proposition that the defense might apply to a boat-race participant who expressly agreed in writing beforehand to assume all risks. As noted, Barber's injuries did not occur as the result of a boat race and there is no evidence that he signed any such document.

---

[10]Respondents characterize this language as holding that the overall viability of assumption of risk as a defense remains an open issue. Instead, the *Whalen* court was clear that the issue only remained open when a boat-race participant had executed a waiver of all associated risks beforehand. Such a waiver is not in evidence here and respondents do not contend that Barber expressly agreed in writing to assume any risks.

*Stimson, supra,* 11 Cal.App.4th 1201, has no applicability here. The *Stimson* court held that a sailboat crew member, injured by a swinging line when the captain executed a course change without warning, was barred by his assumption of all risks inherent in the activity of sailing. Even though that accident occurred on the San Francisco Bay, which respondents contend is a navigable waterway, any mention of federal maritime law is absent from the decision. ■ An opinion is not authority for a proposition not considered. (*Ginns* v. *Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689]; see also *Manning, supra,* 853 F.Supp. on pp. 1189-1190, which rejected the applicability of *Stimson.*) ■ Since federal maritime law governs Barber's claim under the savings to suitors clause (28 U.S.C. § 1333(1)), the trial court erred in granting summary judgment on the ground that Barber assumed the risk of the injury which occurred.

## DISPOSITION

For the reasons set forth above, the judgment is reversed. Appellant Barber to recover his costs on appeal.

Turner, P. J., and Grignon, J., concurred.

Respondents' petition for review by the Supreme Court was denied October 19, 1995.