[No. A103128. First Dist., Div. Two. June 8, 2005.]

HOSANNA HOMES, Plaintiff and Appellant, v.
COUNTY OF ALAMEDA SOCIAL SERVICES AGENCY et al.,
Defendants and Respondents.

COUNSEL

Stoddard, Bergquist, Wood & Anderson, Steven N. H. Wood and David W. Anderson for Plaintiff and Appellant.

Patton Wolan Boxer, Steven C. Wolan, Robert D. Reiter, Lewis Brisbois Bisgaard & Smith, Claudia J. Robinson and Robert M. Shannon for Defendants and Respondents.

---

OPINION

**RUVOLO, J.—**

## I.

### INTRODUCTION

Appellant Hosanna Homes and respondent Families First are both foster family agencies (FFA's) utilized by respondent County of Alameda (the County) for placement of foster children.[1] In the underlying action, Hosanna Homes alleged it was damaged by an "illegal rollover" instituted by Families First and the County. The rollover occurred when a foster family with two foster children severed its relationship with Hosanna Homes, and retained the children in their home after becoming certified as a foster family with Families First. Hosanna Homes appeals the trial court's grant of summary judgment in favor of Families First and the County.

It is undisputed that the rollover in question was requested by the County, the public entity entrusted with the foster children's welfare, and was sanctioned by order of the Alameda County Juvenile Court, the ultimate legal authority over the foster children. Furthermore, the undisputed facts reveal that no statute, rule, regulation or contract was ignored or broken when the foster family left Hosanna Homes and became a certified foster family with Families First. Consequently, we affirm the trial court's grant of summary judgment, concluding there is no basis in law or fact for Hosanna Homes's claims that the conduct of the County and Families First was wrongful in any respect.

---

[1] County placement agencies use licensed private FFA's for the placement of dependent children of the juvenile court who need specialized care. By statute, FFA's are organized and operated on a nonprofit basis and are engaged in the following activities: recruiting, certifying, and training foster parents, providing professional support to foster parents, and finding homes or other temporary or permanent placements for children. (Health & Saf. Code, § 1502, subd. (a)(4).) According to statistics provided by Hosanna Homes, as of July 1, 1993, around the time the placement was made in this case, 20,028 foster children were placed with FFA's in California. This represented 22 percent of the 90,049 children in foster care in California.

## II.

### FACTS AND PROCEDURAL HISTORY

We take the facts from the statement of undisputed material facts filed in support of the summary judgment motion and from the supporting documentary evidence. On December 11, 1993, the juvenile court entered an order committing the foster children, James M. and Victoria M., to the care, custody and control of the Alameda County Social Services Agency for placement in a foster home. (Welf. & Inst. Code, § 300.) The foster children had been severely abused and neglected by their birth parents. On August 22, 1994, the County and Hosanna Homes entered into a written contract for placement of the foster children in the certified family home of Richard and Rebecca Robbins (the Robbins). Hosanna Homes had recruited the Robbins as foster parents and officially certified them on February 9, 1994. This certification permitted the Robbins to operate as a foster family through Hosanna Homes. The Robbins had also entered into a written contract with Hosanna Homes.

The Robbins provided the children with a stable and loving environment for several years before problems arose with Hosanna Homes. In 1996, the Robbins and Hosanna Homes began to have conflicts regarding continued psychotherapy for James M. The Robbins believed that James M. needed more psychotherapy due to a variety of factors, including wetting the bed at age 10, anger management issues, and severe problems at school. Hosanna Homes believed that continued psychotherapy for the child was unnecessary because after two and a half years of therapy with no improvement, further therapy might be unwise.

Around this time, Hosanna Homes's social work director, Paulette Krieger, wrote to all of Hosanna Homes's foster families concerning "several disturbing incidents" which necessitated Hosanna Homes conveying "an extremely urgent and serious message . . . to each of our foster families." In her memorandum, Director Krieger reiterated the following Hosanna Homes policy: "UNDER NO CIRCUMSTANCES, except extreme emergencies where you are unable to reach your Hosanna social worker or the Social Work Director, should you contact or communicate with a county child welfare worker, attorney, or other agent, without specific prior approval from your Hosanna social worker." (Underscoring in original.) Hosanna Homes's no-contact policy was succinctly stated in the memorandum: "No agent from the Department of Social Services is to enter your home or interview you or your family without the presence of a Hosanna Homes worker."

The memorandum went on to explain that direct, unsupervised contacts between foster parents and social service workers were believed to be "circumventing Hosanna's ability to interpret and to protect [the families] from unnecessary confusion, conflicting instructions, unnecessary interruptions to your schedule, possible serious allegations and removal of foster children without Hosanna's knowledge." The memorandum warned that unauthorized communications "exposes you to a potentially very intrusive public bureaucracy from which you may need protection," and communication "should only take place within the confines of the protective buffer offered to each of you by the Hosanna social work staff." Director Krieger's memo explained that the policy was being emphasized for the protection of the foster parents and Hosanna Homes.

Ms. Robbins ultimately contacted the County's child welfare worker assigned to the foster children, Judith Guerra, regarding continued psychotherapy for James M. In 1997, a meeting was held at the Robbins's home with Ms. Guerra and representatives from Hosanna Homes. After the meeting was concluded, and contrary to the Hosanna Homes policy prohibiting direct, unsupervised contacts between foster families and Department agents, Ms. Guerra and the Robbins met in private. Ms. Guerra described multiple alternatives to the Robbins if they could not reach agreement with Hosanna Homes, including adoption, guardianship and the possibility of a "rollover" to another FFA.

The Robbins subsequently investigated a variety of FFA's and determined that giving up their certification with Hosanna Homes and becoming certified by Families First was their best alternative. Verne Teyler, the executive director of Hosanna Homes, expressed his vehement opposition to this plan, even going so far as to threaten to remove the foster children from the Robbins's home. The Robbins were very attached to the foster children and became fearful that the children were going to be removed from their home by Hosanna Homes.

The Robbins then visited Families First for an initial meeting after making a telephone call to them. A representative of Families First told them to attempt to work out their problems, and they were referred back to Hosanna Homes. However, the problems between Hosanna Homes and the Robbins only grew worse.

The Robbins again contacted Ms. Guerra in an attempt to enlist her support for a rollover to Families First. Eventually, Ms. Guerra spoke with a representative of Families First, and indicated her support for the rollover. Ms. Guerra also obtained the approval of her supervisor before agreeing to the rollover. In September 1997, Families First gave Hosanna Homes notice of the anticipated rollover. However, the attempted rollover to Families First was abandoned because Hosanna Homes threatened to sue Families First for interference with contract.

Nonetheless, the problems between Hosanna Homes and the Robbins persisted. Mr. Teyler continued to threaten termination of the foster family relationship. Mr. Teyler admitted warning the Robbins that "unless [they] cooperated with Hosanna in following the proper procedures to determine what was in the best interests of the foster children, Hosanna might have to decertify the Robbins as a foster family. . . . If the Robbins were decertified, then they would not qualify as foster parents."

The Robbins provided several written and oral notifications to Hosanna Homes that they no longer wanted to be certified by Hosanna Homes, and that they wanted to rollover to Families First. Hosanna Homes repeatedly refused their requests, while also threatening to remove their foster children.

On October 10, 1997, Mr. Teyler wrote to the Alameda County Department of Children and Family Services and the attorney appointed to represent the foster children acknowledging that the Robbins had requested to rollover to another FFA. Mr. Teyler confirmed that Hosanna Homes refused to agree to a rollover. He referred to the Robbins as "rogue foster parents" who "feel they can be independent and not accountable." Mr. Teyler claimed the Robbins were "ill advised and may now be well beyond the salvage point." As a result, Mr. Teyler asked the County to remove the children from the Robbins's home and place them in another Hosanna Homes certified home. That same day, Mr. Teyler wrote to the Robbins advising them that Hosanna Homes had contacted the County seeking the relocation of James M. and Victoria M. to another home.

In late 1997, Ms. Guerra took another position within the County's social services agency. She was replaced by Paul Wright as the County's social worker on the case.

In the spring of 1998, a conference was held with representatives from Hosanna Homes; Jim Mehlfeld, the County's FFA placement specialist; Paul Wright; the Robbins; and others. The same issues were once again addressed, and there was no resolution. Several mental health professionals at the meeting, such as James M.'s psychologist and psychiatrist, believed the child's psychotherapy should continue. Hosanna Homes's treatment team, including its consulting psychologist, believed James M. should take a break from therapy, at least temporarily, as he had been in therapy for two and one-half years with no improvement. Given the long-standing dispute between the Robbins and Hosanna Homes, the professionals in favor of continued therapy concluded that rolling over to Families First was probably a good idea. This included James M.'s therapist, psychiatrist, foster parents, the County's social worker, and the supervisors from the County, the child's attorney, and others. It was only the representatives of Hosanna Homes, in reliance on Hosanna Homes's consulting psychologist, who objected to the continued psychotherapy and to the anticipated rollover to Families First.

On March 25, 1998, the County notified Hosanna Homes in writing that the rollover was going to take place. On March 26, 1998, the Robbins sent a letter to Hosanna Homes indicating "[w]e wish to be decertified as foster parents with your agency effective May 1, 1998. Please release relevant information to Families First, Inc. . . ." Hosanna Homes retained counsel to prevent the transfer, who wrote a letter to the County's director of Children and Family Services on May 7, 1998. In part, this letter requested that the County "not discuss placement issues [with the Robbins], including roll-over, transfer, decertification, certification, guardianship, or adoption, unless or until so invited by [Hosanna Homes] the exclusive use current certifying Foster Family Agency."

On May 28, 1998, Kenneth Shaw, program manager for the County's Children and Family Services, sent a letter to Mr. Teyler indicating that the County was removing the foster children from placement with Hosanna Homes. The letter indicated, "This plan will allow us to maintain the court ordered placement of these two minors in the Robbins home and do so under the certification of another foster family agency." The letter further stated it was the County's understanding that the Robbins's certification with Hosanna Homes had expired as of February 8, 1998.[2] The County asked Families First to certify the Robbins's home on May 29, 1998.

---

[2] We decline to discuss the evidence regarding whether or not the Robbins's certification with Hosanna Homes had expired on February 8, 1998. There are material issues of disputed fact with regard to this issue, precluding summary judgment on this basis.

On May 29, 1998, Mr. Mehlfeld, the County's FFA placement specialist, requested that the court issue an order approving the rollover to Families First. He explained, "This placement is a 'rollover,' in which the [*sic*] Mr. and Mrs. Robbins will transfer their certification from Hosanna to the Families First FFA and the children will remain in the Robbins home. The reason is that the Robbins want to transfer and Alameda is in agreement with, and supports this transfer in order to allow the family to receive improved services." On June 1, 1998, juvenile court referee Claudette Brooks approved the rollover, and on June 2, 1998, the order was filed with the court. Mr. Teyler was "outraged" by the conduct of the Robbins, Families First and the County. He wrote to a state official, Ms. Kathy Eddings, a licensing program analyst with Community Care Licensing, the County, and Families First, indicating his refusal to accept the rollover.

Less than a month after entry of the juvenile court's order, Hosanna Homes filed this lawsuit against the County, Families First, and the Robbins. Hosanna Homes sought recovery for common law breach of contract and tort claims, as well as an injunction prohibiting the Robbins from "[d]iscussing placement issues with the County unless specifically invited to do so by HOSANNA HOMES."

The complaint went through several amendments. The iteration before us, the third amended complaint, alleges causes of action against the County for breach of contract, breach of the covenant of good faith and fair dealing, inducing the Robbins to breach their contract with Hosanna Homes, and negligently and intentionally interfering with Hosanna Homes's prospective economic relationship with its certified foster family. Causes of action against Families First include unfair and unlawful business practices in violation of Business and Professions Code section 17200, inducing breach of contract, and negligent and intentional interference with prospective economic advantage. The monetary damages allegedly sustained by Hosanna Homes were described as follows: "The County's breach caused Hosanna damages in that Hosanna had to refund money paid for the Robbins' foster children and lost the revenue it would have received from the County had the Robbins remained with Hosanna, estimated to be $246,835[] and consisting of the revenue Hosanna would have been entitled to through the foster children's 18th birthdays. In addition, Hosanna is entitled to revenue for any other foster children that would have been placed with the Robbins."

After three years of discovery and more than 30 days of depositions, Families First and the County filed a motion for summary judgment.[3] The trial court granted summary judgment to both defendants "in light of the Order of the Juvenile Court." This appeal followed.

## III.

### DISCUSSION

 The purpose of the summary judgment procedure is to identify those cases in which "there is no triable issue as to any material fact." (Code Civ. Proc., § 437c, subd. (c).) For practical purposes, an issue of *material* fact is one which, in the context and circumstances of the case, "warrants the time and cost of factfinding by trial." (*Martin v. Lockheed Missiles & Space Co.* (1994) 29 Cal.App.4th 1718, 1735 [35 Cal.Rptr.2d 181].) In other words, not every issue of fact is worth submission to a jury. On summary judgment the trial court must separate those cases in which there are *material* issues of fact meriting a trial from those in which there are no such issues.

 On appeal, we review the trial court's decision to grant or deny the summary judgment motion de novo, on the basis of our independent examination of the record. (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 163 [80 Cal.Rptr.2d 66]; *Villa v. McFerren* (1995) 35 Cal.App.4th 733, 741 [41 Cal.Rptr.2d 719]; *Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 579 [37 Cal.Rptr.2d 653]; *Jambazian v. Borden* (1994) 25 Cal.App.4th 836, 843–844 [30 Cal.Rptr.2d 768].) "We also independently review the trial court's determination of questions of law. To that end, we are not bound by the trial court's stated reasons or rationale. In short, we review the summary judgment without deference to the trial court's determination. [Citations.]" (*Eisenberg v. Alameda Newspapers, Inc.* (1999) 74 Cal.App.4th 1359, 1376 [88 Cal.Rptr.2d 802].) Like the trial court, we must consider all the evidence properly identified in the papers submitted, except evidence to which objections have been made and sustained by the court. (Code Civ. Proc., § 437c, subd. (c); *Barber v. Marina Sailing, Inc.* (1995) 36 Cal.App.4th 558, 561, fn. 2 [42 Cal.Rptr.2d 697].)

The questions before us in this appeal are pure questions of law. The material facts necessary for summary judgment are undisputed. The issues framed by Hosanna Homes's third amended complaint all embody the conclusion of law that if the original FFA refuses to accept the surrender of a

---

[3] On May 8, 2001, Hosanna Homes dismissed the Robbins as defendants in this action. Consequently, the complaint's allegations against the Robbins are omitted from this opinion. We also omit from this opinion postjudgment facts about the Robbins that appear in the briefs but have no bearing on whether the trial court's grant of summary judgment was correct.

foster family's certification with that agency, any subsequent rollover to another FFA is illegal. The essence of its claim is that the statutory scheme governing FFA's makes the relationship between each FFA and its certified foster families an exclusive one. This exclusivity prohibits rollovers without the consent of the original certifying FFA. Also, Hosanna Homes asserts that a rollover would result in the foster family having overlapping dual certifications (one from the original FFA and one from the FFA to whom the family would rollover), a situation not sanctioned by the statutory scheme.

■ In order to understand Hosanna Homes's arguments, some examination of the statutory scheme governing FFA's is necessary. When the juvenile court orders removal of a dependent child from his or her parents under the authority of Welfare and Institutions Code section 361, its alternatives for the child's care include placement "under the supervision of the social worker" with an FFA to be placed in a suitable foster family home "which has been certified by the agency as meeting licensing standards." (Welf. & Inst. Code, § 361.2, subd. (e)(6).)

Placement of dependent children in certified family homes is further governed by the California Community Care Facilities Act (hereafter the Act) (Health & Saf. Code, § 1500 et seq.). The Act's provisions reflect a legislative determination that "because of the more difficult nature of foster children and the increased costs of caring for them, it is becoming difficult to recruit and train foster parents. One solution is to encourage the development of private, nonprofit foster family agencies which recruit, screen, certify, train, and provide professional support services to foster parents." (Historical and Statutory Notes 38B, pt. 2 West's Ann. Health & Saf. Code (2000 ed.) foll. § 1502, p. 123.) Health and Safety Code section 1501.1 announces that it is the state's policy to "facilitate the proper placement of every child in residential care facilities where the placement is in the best interests of the child." (See generally *Montessori Schoolhouse of Orange County, Inc. v. Department of Social Services* (1981) 120 Cal.App.3d 248, 254–255 [175 Cal.Rptr. 14].)

■ An FFA is defined as "any organization engaged in the recruiting, certifying, and training of, and providing professional support to, foster parents, or in finding homes or other places for placement of children for temporary or permanent care who require that level of care as an alternative to a group home." (Health & Saf. Code, § 1502, subd. (a)(4).) Under the Act, foster children are placed with a licensed FFA, which then has the duty to place the children with one of its certified foster families. (Health & Saf.

Code, § 1536.2; see generally Welf & Inst. Code § 366.26, subd. (c)(5) [the "care, custody, and control of the child" may be "transferred . . . to a licensed foster family agency. [¶] [This agency] . . . shall place the child in a suitable licensed or exclusive-use home . . . ."]; see also Health & Saf. Code, § 1506.5.) FFA's have wide-ranging responsibilities regarding the placement and care of foster children in their certified family homes. (See Cal. Code Regs., tit. 22, § 88030 et seq.) The FFA's responsibilities for its foster children range from developing and implementing needs and service plans, treatment plans, medical care, caring for special needs, and discharge plans. (*Id.* at §§ 88068–88069.)

■ A certified family home, such as the Robbins's, is distinct from a licensed foster home. The certified family home is exempt from the licensing requirements otherwise applicable to a foster home, as their compliance with requirements necessary for the placement of children is "monitored through and assured by the Foster Family Agency." (See Cal. Code Regs., tit. 22, § 89207, subd. (c)(2)(A).) However, despite the statutory authorization allowing the placement of children in foster family homes through FFA's, the placing agency remains ultimately responsible for the care, custody, and control of the placed children. (Health & Saf. Code, § 1506.5, subd. (d).)

■ As Hosanna Homes repeatedly emphasizes, the relationship between an FFA and its certified family homes is exclusive, meaning that no other FFA can simultaneously certify that family home (see, e.g., Cal. Code Regs., tit. 22, § 88001, subd. (c)(3); Health & Saf. Code, § 1506, subd. (d) [while certified, a family is "used only by [its] foster family agency for placements"].) In other words, the FFA is the only entity that can certify a family home, and that certification establishes an exclusive relationship between the FFA and the family home so long as such certification is in effect (see Cal. Code Regs., tit. 22, §§ 88001, subd. (c)(2) & (3), 88030, subd. (a).) The certification lasts from year to year (Health & Saf. Code, § 1506, subd. (b)(2); Cal. Code Regs., tit. 22, § 88030, subd. (c)(6)), and during that year the family home cannot accept placements from other FFA's. (Cal. Code Regs., tit. 22, § 88001, subd. (c)(2) & (3).) The certificate of approval of any certified family home is not transferable and is void upon a change of location or certified parents except under emergency conditions. (Cal. Code Regs., tit. 22, §§ 88030, subd. (e), 88033.)

In the third amended complaint, Hosanna Homes repeatedly makes the allegation that the exclusivity provisions of the Act were violated because there was illegal dual certification by both Hosanna Homes and Families First on May 29, 1998, the date of the Robbins family's rollover to Families First.

Hosanna Homes posits that "[i]f a rollover is accomplished over the objection of the first certifying FFA, it is illegal because it results in dual certification and interferes with the foster families' role to provide and implement treatment and care of the children."

■ We believe that the exclusivity provisions of the Act were not intended to prevent rollovers from one FFA to another, such as occurred in this case, particularly where the placing agency, and indeed the juvenile court, both determine that a change in FFA's, and not in the foster family, is in a dependent child's best interest. On their face, the purpose of the statutes and regulations dealing with exclusivity is simply to promote stability for dependent children, and to advance the noncompetitive environment in which the Legislature hoped FFA's would recruit foster families.[4] (See Health & Saf. Code, § 1506, subd. (b)(1).) However, the fact that the exclusivity statutes seek to attain that goal by requiring Hosanna Homes and Families First to maintain separate certified family homes does not subjugate foster families to a permanent and unseverable alliance with a particular FFA. To the contrary, if a foster family wishes to surrender its certification with a particular FFA, that surrender is effective regardless of whether the FFA wants to accept it.

Our reading of the Act is reinforced by several provisions that contemplate the situation examined herein, where a foster family surrenders their certification and rolls over to a new FFA. For example, Health and Safety Code section 1525.25, subdivision (a) of the Act expressly recognizes that foster family homes can change their licensing or certification status. "It is the intent of the Legislature to provide for proper case management and orderly transition in placement when family home licensing or family home certification changes occur. Placing, licensing, and foster family agencies shall be advised in a timely manner that a licensed foster family home or certified home intends to change its licensing or certification status."

Moreover, regulations governing certified family homes provide that they "shall conform to the regulations for 'General Licensing Requirements,' Chapter 1, commencing with Section 80000 . . . ." (Cal. Code Regs., tit. 22, § 88030, subd. (f).) Section 80035 governing conditions for forfeiture of a

---

[4] Hosanna Homes asserts that sanctioning rollovers would defeat the legislative objective that FFA's are to operate in a noncompetitive environment. But, the only section in the Act which refers to noncompetition is Health and Safety Code section 1506.6, which bars foster families from being concurrently certified by more than one FFA. It notes that "[i]t is the intent of the Legislature that public and private efforts *to recruit foster parents* not be competitive and that the total number of foster parents be increased." (Italics added.) Thus, there is no express intent by the Legislature precluding foster families who are certified with one FFA from exploring the possibility of transferring to another FFA. Indeed, under the facts of this case it clearly would have been inimical to the best interests of foster children to so provide.

community care facility license states: "(a) Conditions for forfeiture of a community care facility license may be found in Section 1524 of the Health and Safety Code." Health and Safety Code section 1524 reads in part: "A license shall be forfeited by operation of law prior to its expiration date when one of the following occurs: [¶] . . . [¶] (b) The licensee surrenders the license to the department."

■ The foregoing provisions clearly contemplate that a foster family may surrender a license or certification, which the certifying FFA must then accept. Hosanna Homes can cite no statute or regulation which prohibits such a procedure. Apparently, it is a practice that occurs routinely in the industry, and the original FFA cannot refuse to release the foster parents in order to thwart a rollover to another FFA. Thus, the provisions of the Act relied upon by Hosanna Homes, all of which deal with exclusivity and prohibit dual certification of foster families, are inapplicable to this action, and do not render the rollover examined herein illegal.

At oral argument, Hosanna Homes warned that judicially sanctioning rollovers would subject dependent children to the whims of foster families, some of whom might be motivated to change FFA's simply by a promise of more money. Nothing so mercenary and callous occurred here; and if it arose in another case in the future, we trust it would be readily apparent to the social services workers and others entrusted with assuring that the rollover to another FFA was in the children's best interests. On this record, there is not even a whisper that the Robbins were motivated to surrender their certification with Hosanna Homes by anything other than a desperate search for better therapeutic care for James M., a judgment joined in by the child's therapist, psychiatrist, social worker, and attorney. Moreover, the fact that the rollover took place with juvenile court approval, after more than two years of repeated meetings with Hosanna Homes and the County's child placement officials, renders Hosanna Homes's argument completely unfounded.

Since rollovers are not prohibited by the Act, and the placing agency and the juvenile court approved the rollover, there is nothing further to be adjudicated as a matter of law.[5] We also point out that we can find nothing in this record indicating that the certification of the Robbins family by Families First was unlawful, unfair, fraudulent or in violation of any public policy. While Hosanna Homes alleges "wrongful conduct by [the] County and

---

[5] We stress that our opinion is limited to the facts of this case; that is, where a rollover occurs with the authorization and consent of the public placing agency and approval of the juvenile court. We do not intend to express an opinion as to the legality of other factual scenarios not before us.

Families First in encouraging and enticing the Robbins to rollover," the undisputed facts show that it was the Robbins, and the Robbins alone, who were the driving force in the decision to surrender their certification as a licensed family home with Hosanna Homes. Moreover, the undisputed record demonstrates that Hosanna Homes had ample advance notice in writing from both the Robbins and the County that the rollover was going to take place. Significantly, on June 2, 1998, the juvenile court issued its order determining that the best interests of James M. and Victoria M. would be served by a change in the FFA charged with their care. The court determined that Families First should become the Robbins's FFA, with the children themselves remaining in the Robbins's home, where they had then lived for almost four years. In seeking and securing this order, the County and the juvenile court complied with all necessary notice requirements as set out in Welfare and Institutions Code section 386.[6]

Lastly, and with breathtaking hubris, Hosanna Homes argues that despite the juvenile court's "best interests" finding, the court's dispositional order was impermissible as a matter of law. It claims that the Robbins, "the decertified foster family," should not have been allowed to retain placement of the children. Hosanna Homes goes on to argue that "since the children [were] placed with the FFA, not the home, the children have to be returned to the FFA for placement in another certified home. Thus, it was legally impossible for the Robbins to have decertified themselves over the objection of Hosanna and still have retained placement of the children."

This argument is entirely without merit. The fact that, in compliance with California law, Hosanna Homes recruits, educates and maintains foster families does not transform it into a de facto government agency or an ostensible arm of the juvenile court. Nor do the public welfare statutes cited by the parties authorize an FFA to threaten to remove foster children from a family home with long-standing ties to the children in an effort to prevent a rollover deemed by the social services agency, and ultimately by the juvenile court, to be in the children's best interests. It is the juvenile court, not Hosanna Homes, that has the ultimate responsibility of ensuring that the placement decisions made with respect to dependent children are in their best interests. As to the court's action in this case, the record reveals that the

---

[6] Welfare and Institutions Code section 386 provides that "[n]o order changing, modifying, or setting aside a previous order of the juvenile court shall be made either in chambers, or otherwise, unless prior notice of the application therefor has been given by the judge or the clerk of the court to the social worker and to the child's counsel of record . . . ." There is nothing in this section that gives an FFA the right to receive notice of a hearing scheduled by the County regarding a change in placement.

children had enjoyed what all the professionals described as a highly favorable living environment with the Robbins, and that they had bonded closely with the Robbins family. Since at this point in the proceedings, the juvenile court's focus had shifted to the children's needs and best interests, the juvenile court would have been remiss in modifying the placement order.

Which brings us to the point that, *even if* Hosanna Homes genuinely believed it was in the children's best interests to be taken from the Robbins and placed in another one of its certified family homes, the proper forum for this argument was the juvenile court. A petition to modify pursuant to Welfare and Institutions Code section 388 was available to Hosanna Homes to convince the juvenile court to reconsider its order.[7] (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415 [33 Cal.Rptr.2d 85, 878 P.2d 1297].) To prevail on a section 388 motion, the moving party "bears the burden of showing both a change of circumstance exists and that the proposed change is in the child's best interests. [Citation.]" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47 [82 Cal.Rptr.2d 426].) Bonding with foster parents is not dispositive, but the disruption of an existing bond between dependent children and their caretakers is a critical factor in deciding a section 388 motion. (See *In re Jasmon O., supra*, 8 Cal.4th at p. 421 ["evidence that disruption of the bond with foster parents will cause the child serious, long-term emotional damage may be crucial in ascertaining the best interests of the child."].)

In the end, despite Hosanna Homes's repeated threats that it was going to remove the foster children from the Robbins's care if they attempted to rollover to another FFA, when it came time to take the legal steps necessary to sever the foster family relationship, Hosanna Homes took no such action. Instead of contesting the rollover in the juvenile court, counsel for Hosanna Homes conceded at oral argument on summary judgment that it was content to "let that placement remain and just sue the County." Thus, it met the problem not by fighting for what it believed was best for the foster children in its care, but by filing a rapacious lawsuit asserting only commercial claims for the revenues it asserts it will lose by virtue of the rollover. Thus, Hosanna Homes ignores the very *raison d'être* for its existence, and the overriding objective of this state's child welfare statutory scheme—to provide for children who must seek the shelter of the foster care system.

---

[7] Welfare and Institutions Code section 388 provides, that "[a]ny parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court . . . for a hearing to change, modify, or set aside any order of court previously made . . . . [¶] . . . [¶] *If it appears that the best interests of the child may be promoted by the proposed change of order,* . . . the court shall order that a hearing be held . . . ." (Italics added.)

## IV.

DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to the County and Families First.

Haerle, Acting P. J., and Lambden, J., concurred.